Docket No. 105942.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DANIEL RAMSEY, Appellant.

*Opinion filed October 7, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

After a jury trial in the circuit court of Hancock County, defendant, Daniel Ramsey, was convicted of two counts of first degree murder (720 ILCS 5/9–1(a) (West 1996)), three counts of attempted murder (720 ILCS 5/8–4(a), 9–1(a) (West 1996)), and one count each of aggravated criminal sexual assault (720 ILCS 5/12–14(a) (West 1996)), home invasion (720 ILCS 5/12–11(a) (West 1996)), and residential burglary (720 ILCS 5/19–3(a) (West 1996)), and sentenced to death and several terms of imprisonment. His convictions were reversed by this court. *People v. Ramsey*, 192 Ill. 2d 154 (2000). He subsequently pleaded guilty to the intentional and felony murders of two victims, the attempted murders of three victims, aggravated criminal sexual assault, and home invasion. A jury found

him eligible for the death penalty and determined that he should be sentenced to death. The trial court sentenced him to death and imposed prison sentences totaling 60 years on the other convictions. His appeal lies directly to this court under Supreme Court Rule 603 (134 Ill. 2d R. 603). For the reasons set forth below, we affirm his conviction and sentence.

## BACKGROUND

On July 9, 1996, Daniel Ramsey, then 18 years old, was taken into custody at the Sloop residence in rural Hancock County. He gave the police an account of the events of the previous evening, in which he admitted killing two young women and shooting two children and his former girlfriend, intending to kill them.

### Defendant's Statement

According to defendant, 17-year-old Rachel Sloop had recently broken up with him. They had agreed to remain friends and he was still welcome at the Sloop home. He had called Rachel almost every day since the breakup. On the afternoon of July 8, defendant was visiting the Sloop home. Rachel's mother told Rachel that it was time for defendant to leave because she did not have enough food to invite him to stay for dinner. He remained for a while longer and then went home.

Later that evening, another girl, Michelle Haist, told defendant that Rachel never truly liked him and that she had been using him because he gave her presents. Upset by her comments, defendant took a .22-caliber pistol from the trunk of his car and placed it underneath the front seat. He drove from his home in Keokuk, Iowa, to the home of another friend, L.M., in Basco, Illinois.

At about 11 p.m., defendant and L.M. went for a drive. L.M. told her mother that she would be home in about half an hour. They talked about Rachel and the breakup and began to argue. He called her a "bitch" and she slapped him. He struck her with his fist and then stopped the car near a grain bin. She slapped him again and he pulled the car closer to the grain bin. She got out of the car and came around to the driver's side. Then he got out of the car and they continued to fight, shoving each other, until L.M. got back into the car on the

-2-

passenger side. Defendant then pinned L.M. down on the front seat of the car and ripped at her clothing. She told him several times to "stop" and to "quit it," but he sexually penetrated her anyway and ejaculated.

When he finished, L.M. told him that he was no longer her friend and that she would tell what he had done. He took a roll of duct tape from the trunk of his car and wrapped tape around her head, including her eyes, and around her arms, her wrists, and her hands. After she tried to run away, he also taped her lower legs. He lifted her over his shoulder and walked to a nearby empty grain bin and placed her inside, where he told her to stay.

Defendant went back to his car, retrieved the pistol, and returned to the grain bin. He shot her twice. Then he got into his car and left. He later told police that he shot L.M. because she said she would get him into trouble. She died as a result of her wounds.

Defendant told police that he decided at this point that he wanted to commit suicide and that he wanted Rachel to see him do it. He drove for a while, thinking of a way to get Rachel's mother, Barbara Sloop, and a houseguest, Kim Haist, out of the house. At about 11:30 p.m., he called the Sloop residence from a pay telephone at a gas station in Carthage, Illinois, and told Barbara that she and Kim were needed at Kim's apartment in Carthage, because Kim's ex-fiancé, Terry Hamelton, had ransacked her apartment there.

He then sped to the Sloop home. He turned the lights off in his car and waited until he saw the adults leave. Once he was sure that Barbara and Kim were gone, he parked his car on the side of the road beyond the Sloop home and walked through a cornfield to the home, carrying wire cutters, a flashlight, and his pistol. He looked in the windows and saw that Rachel and her 12-year-old sister, Lonna, were in the living room watching television. To ensure that Barbara could not telephone the girls from her cell phone once she discovered the ruse, he cut the telephone line to the house. He entered the house through the unlocked back door.

He approached Rachel quietly, startling her by touching her. They went into the dining room and talked for a while as she sat at the table with her back to him. According to defendant, he had not planned to shoot her, but she said something that set him off and he pulled out the gun and shot her in the back of the neck. He could not recall what

she said to upset him.

Lonna, who was in the living room lying on the sofa, began screaming, so he shot her twice. Kim's two children, Cody Hamelton, age 3, and Courtnie Hamelton, age 2, were sleeping upstairs. When defendant heard them crying, he went upstairs and shot both children. (An autopsy revealed a nonfatal wound to Lonna's neck and a fatal wound to the top of her head. The children survived, with serious permanent injuries.)

Defendant told police that he then tried to shoot himself in the head with his pistol, but that it misfired. He knew that there was a shotgun in the house, which he retrieved and again tried to kill himself. The shotgun slipped as he fired, causing a superficial wound to the back of his head, but he believed that he was dying.

When he came back downstairs, he found Rachel on the floor, slipping in and out of consciousness. He lay down on the floor next to her and fell asleep. He awoke when she got up to go to the bathroom. She walked out of the house and he followed. The police, who by this time had been called to the house by Barbara Sloop, were outside and took him into custody. He led them to L.M.'s body and later waived his *Miranda* rights and made the statement summarized above, which was videotaped.

Procedural History

Following a jury trial in which he raised the defense of insanity, defendant was convicted of the murders of L.M. and Lonna Sloop and other felonies. The jury found him eligible for the death penalty based on the cold, calculated, and premeditated manner in which the crimes were committed. 720 ILCS 5/9–1(b)(11) (West 1996). After a hearing, the jury found no mitigating factors sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death for the murders and to terms of imprisonment for the other crimes. This court reversed defendant's convictions and remanded for a new trial. *Ramsey*, 192 Ill. 2d at 158-59.

Pretrial proceedings concluded in April 2007 with the selection of a jury. Shortly thereafter, the parties advised the court that a plea agreement had been reached under which defendant would plead guilty to the murders of L.M. and Lonna Sloop, the attempted

murders of Rachel Sloop, Cody Hamelton, and Courtnie Hamelton, the aggravated criminal sexual assault of L.M., and home invasion. The State agreed to dismiss four other counts. The trial court admonished defendant regarding the effect of a guilty plea and of the rights he was relinquishing. The court also determined that the plea was voluntary and was not the result of threats or promises.

The matter proceeded to a capital sentencing hearing before the jury.


Capital Sentencing Hearing–Eligibility Phase

At the eligibility phase, the State introduced a copy of defendant's birth certificate, showing his date of birth as March 30, 1978. The State also offered a certified copy of five judgments of guilt based on defendant's guilty pleas.

L.M.'s mother testified that her daughter and defendant had been "platonic" friends who talked daily on the phone. He often visited the Marson home to watch movies with L.M. She allowed L.M. to go for a drive with defendant at approximately 11 p.m. on the evening of July 8, 1996, and expected her daughter to be home in half an hour. When she was not home by 3 a.m., she called the police.

Crime scene investigator Steve Zuber of the Illinois State Police described the grain bin where L.M.'s body was found as being in a field of fairly mature corn, "about a hundred feet" off the road and "surrounded with fairly dense vegetation." There was a path leading from the road to the empty bin, but it was also covered with vegetation. Some of the vegetation was "crushed-down" as if a vehicle had recently driven on it. There were tire tracks and shoe prints in the dirt behind the grain bin, where the vegetation was less dense. He took photographs of the tire tracks and shoe prints. Zuber identified several distinctive aspects of the shoe prints that identified the shoes as Nike brand shoes.

Zuber further testified that he found the body of L.M. inside the grain bin, with her head "wrapped almost completely in duct tape from her eyebrows down to her chin with no openings left for her eyes, ears, nose, or mouth." Her arms and wrists and lower legs were also bound with duct tape. Her shorts were torn and there appeared to be blood on her underwear. Her fingers were also bloody. Zuber

identified a photograph of the soles of L.M.'s shoes and noted that no footprints matching her shoes had been seen in the area of the grain bin.

Barbara Sloop testified regarding the dating relationship between defendant and Rachel and Rachel's decision to end it because she felt defendant was "smothering" her with his constant attention. While the young couple was dating, defendant visited the Sloop home every day and spent some weekends there. After the breakup, he continued to be a regular visitor and to call Rachel almost every day. When she returned home after work on the evening of July 8, 1996, defendant was there. Kim Haist, a family friend, was also there. She had been staying in the Sloop home with her two small children because an ex-boyfriend had recently set fire to her car. Barbara and Kim discussed the security of the Sloop home and defendant interjected that "if anybody wanted in your home, whether your doors were locked or not, they would get in." Shortly thereafter, Barbara told defendant that dinner was almost ready and that he could not stay because she did not have enough food for everyone. He did not leave right away, but did eventually leave.

Barbara said that she was asleep on the couch in the living room when the telephone rang at about 11:30 p.m. She recognized defendant's voice. He told her that Kim's former boyfriend had ransacked her apartment and was going to pour gasoline on it and set it on fire. He told her to get Kim and come directly to her apartment in Carthage and not to go to the police station. She woke Kim and then Rachel, so that Rachel could listen for the children in case they woke up. When she and Kim arrived at Kim's apartment, neither defendant nor the police were there and nothing was amiss. She called home and got a busy signal, so she drove to the sheriff's office.

Thomas Merchie, a crime scene investigator with the Illinois State Police, testified that he photographed a brown or tan Ford bearing Iowa license plates that was parked east of the Sloop residence on a gravel road leading into a field. The car was separated from the house by a corn field and a bean field. He measured the distance at approximately 417 feet from the car to the house. Merchie observed a police radio sitting in the front seat of defendant's car. The radio was turned on and he could hear police radio frequency traffic. After arranging for the car to be towed for later processing, Merchie went

to the Sloop home to process the scene there.

In the living room, he found the body of a young woman on the couch. She was partially covered with an afghan and her head was on a pillow. She had been shot in the right side of the neck, with the bullet traveling through the pillow. She had a second gunshot wound to the top of her head.

In an upstairs bedroom, Merchie found a shotgun on the floor near an empty gun case and a .22-caliber handgun. Outside the residence, he found three telephone wires that had been cut. He also found a blue-handled "side cutter," or wire cutter, in the grass outside the house. He found no signs of forced entry into the house.

After being accepted as an expert witness without objection by the defense, Dr. Travis Hindman testified regarding the autopsy he performed on L.M. He described the duct tape that was wrapped "very tightly" from her forehead to her chin. Her arms were taped to her chest and her legs were taped together. She had abrasions on the fingers of both hands. Her shorts were torn and stained. He found bruising and tearing in the vaginal area, compatible with a sexual assault. Hindman recovered bullet fragments from a gunshot wound to the back of her head. The cause of death was severe brain trauma due to the gunshot wound, with a possible contributory cause of asphyxia due to her face having been covered with duct tape. Other physical findings demonstrated that L.M. was alive when she was shot. Had she not been shot, she eventually would have suffocated.

Hindman also testified regarding the autopsy of Lonna Sloop. She had one gunshot wound to the side of her neck and one to the top of her head. The bullet penetrated a pillow before entering her neck, pulling some of the pillow filling with it. The wound was about one-inch deep and when the pillow fabric rebounded, it pulled the filling and the bullet with it. As a result, the neck wound was survivable. The second wound was fatal.

The State's final witness in the eligibility phase was Rachel Sloop White, now age 28. She testified that she began dating defendant in March 1996, when she was 17 years old. During the several months that they dated, he came to her house "every day" and stayed "all day." She decided to end the dating relationship in late June 1996 because he was too possessive and she felt that she had no "space" of

her own. After she ended the dating relationship, he continued to visit the Sloop home every day and they remained friends.

She explained that Kim's brother, Terry Haist, was engaged to Amy Sloop, Rachel's older sister. Kim and her two children were staying with the Sloops because she suspected the children's father, Terry Hamelton, of setting fire to her car the previous weekend. On the afternoon of July 8, 1996, defendant was visiting the Sloop home and the fire was discussed.

At about 11:20 p.m. that night, Rachel's mother woke her up, explaining that she and Kim had to leave the house. Rachel was afraid to be the oldest person in the house with only her 12-year-old sister, Lonna, and two small children. She woke Lonna and asked her to accompany her downstairs so she would not be alone. Lonna lay on the couch and fell asleep while Rachel sat in a recliner, watching television.

She looked up and saw defendant coming through the dining room toward her. When she asked what he was doing there, he replied that her mother knew he was there and that it was "okay" for him to be in the house. He asked her to come into the dining room to talk to him and she complied. Toward the end of that discussion, he asked Rachel if she would resume dating him.

At this point in her testimony, the State rested its case on eligibility. The defense presented no evidence at this stage of the proceedings. Closing arguments were made and the jury was instructed.

The State noted that defendant was 18 years old and that he had pleaded guilty to first degree murder. In addition, the State argued that it had proven the existence of three eligibility factors beyond a reasonable doubt: (1) defendant was convicted of murdering two individuals and their deaths were the result of his intent to kill (720 ILCS 5/9–1(b)(3) (West 1996)); (2) defendant killed L.M. in the course of another felony, aggravated criminal sexual assault (720 ILCS 5/9–1(b)(6) (West 1996)); and (3) both murders were committed in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom"

(720 ILCS 5/9–1(b)(11) (West 1996)).

In support of the third factor, the State argued that the murder of L.M. was cold, calculated, and premeditated, as shown by the fact that the defendant brought a gun and duct tape when he went to Marson's house and that he drove only 1.6 miles from the Marson home before leaving the road to park behind a grain bin that was surrounded by dense vegetation, where he raped her, bound her with duct tape, placed her inside the grain bin, and shot her.

Similarly, the State argued, the murder of Lonna Sloop was cold, calculated, and premeditated. Defendant lied to Barbara Sloop to get the adults to leave Rachel, Lonna, and two small children alone in the house, using information about who was in the home that he obtained in an earlier visit that day. He sped to the Sloop home and parked off the road with his headlights off, so that he could see the adults leave. Then he parked his car where it could not be seen from the house, cut through a cornfield to reach the house, and cut the telephone lines. After gaining access to the house, he shot Lonna in the top of the head as she lay on the living room couch.

Defense counsel emphasized that defendant, after receiving *Miranda* warnings and knowing that he did not have to speak, cooperated with the police. He gave a full statement and took responsibility for his actions at that time and later when he pleaded guilty. If he had premeditated killing L.M., counsel argued, he would not have spent half an hour visiting with her in her home before taking her out that night. Counsel also noted that defendant did not try to disguise his voice when he called the Sloop home. Thus, counsel suggested, because he did not try to conceal his identity from his victims' mothers, he did not premeditate the murders.

The jury found, unanimously, that each of the three aggravating factors existed.

Capital Sentencing Hearing–Evidence in Aggravation

After opening statements by both sides, Rachel Sloop White resumed the stand as the State's first witness in the second stage of the capital sentencing hearing. She testified that she was introduced to defendant by a mutual friend, L.M., at the Keokuk, Iowa, YMCA. Eventually, they began dating and she attended prom with him in

March 1996. She broke up with him later that spring by giving him a letter that she had written. She wanted to continue to be his friend.

On the afternoon of July 8, 1996, defendant was visiting her house. Rachel, Lonna, Kim, and defendant talked about the incident in which Kim's car caught fire. There had also been a fire in defendant's car. They all suspected Terry Hamelton of setting the fires.

At some point in the afternoon, defendant drove Kim into town to run errands "to do with the fire" and then brought her back to the house. Rachel's mother returned from work about 4:30 p.m. and began cooking dinner. She told Rachel that it was time for defendant to leave because there was not enough food for him to eat with them that evening. After Rachel told defendant to leave he "moved at a slow pace," and when he did finally leave, called her a "bitch."

She was asleep later that night in her second-floor bedroom when her mother woke her, explaining that she had received a telephone call from defendant telling her that she and Kim were needed in town at Kim's apartment because Terry Hamelton was ransacking it.

Rachel and Lonna were in the living room watching television when she heard someone in the dining room. She saw defendant coming toward her. Defendant asked to talk to her in the dining room.

They sat at the table, smoking cigarettes and talking. When he asked her if she would resume dating him, she tried to change the subject, saying that she needed to bring the dogs inside. She went to the front door to let the dogs in and defendant accompanied her. Then they went back to sit at the dining room table. From her seat at the table, she could see out the window and she saw the headlights of a car coming down the road toward the house. When she told defendant that a car was approaching the house, he shot her in the head, just above and behind her right ear. Before she "fell over," she heard her sister, Lonna, say, "Don't shoot me."

Rachel remained seated, with her head resting on the table, as she slipped in and out of consciousness. At some point, defendant returned to the room. He was bleeding and he let his blood "just go all over" her. Then he asked her to lie down on the floor next to him. She used a chair cushion as a pillow and lay down on the floor, covering herself with a blanket. He kept touching her, asking her if she was still

alive. She responded, "Stop touching me before I die." She asked defendant if he had shot anyone else and he told her that he thought he had killed her sister, but he denied having shot the two children.

Eventually, she told defendant that she had to go to the bathroom. He initially refused to let her leave, but she told him that she would leave the bathroom door open. When she came out of the bathroom, she did not see defendant, so she opened the front door and walked outside where the police were waiting. (Later testimony by a state trooper established that it was approximately 5:52 a.m. on July 9, 1996, when Rachel exited the house, followed shortly thereafter by defendant, who surrendered to the police.)

Michelle Haist, the younger sister of Kim and Terry Haist, testified that she knew defendant because he was dating Rachel, whose sister, Amy, was engaged to Michelle's brother, Terry. Defendant "was always around." In 1996, Michelle was living with Kim in Carthage, Illinois.

On July 3, 1996, Michelle had been at Kim's apartment when Terry Hamelton came by and told her that he wanted to see the children, Cody and Courtnie. Kim had not been home at the time. Later that night, Michelle was awakened by flashing lights. Kim's car was on fire and the flames were "starting to come in the window."

On several subsequent evenings, defendant spent the night at Kim's apartment, along with Michelle, her boyfriend, and Kim and the children. Everyone was on edge. The night of July 6, defendant "kept going in and out," then he ran into the apartment saying his car was on fire. When she went out to look, she saw several newspapers in the backseat that had been set on fire. The flames had gone out on their own and it was not necessary to call the fire department.

Michelle also testified that she was at the Sloop home on the afternoon of July 8, 1996. She noted that defendant and Rachel "were having some kind of argument." She accepted a ride back to Keokuk from defendant. Rachel was yelling after him as they pulled out of the driveway. Defendant said that he felt like pulling "in front of a semi right now." She told him that it was "stupid" to kill himself over "some girl" and that he just needed to move on. He would not accept that Rachel did not want to be with him.

Defendant dropped Michelle at a friend's house and then left for

a bit, saying that he had to go to his house "to do something." Later, he returned and offered Michelle a ride to her home. She said she was not ready to go, so he stayed. Then he left a second time and came back, again offering to take her home. She told him she intended to stay there for the night. He "stayed there for a while and then he eventually left." Michelle was "annoyed because he just kept repeating it over and over and kept asking [her] to go ***. He just persistently kept asking me over and over."

Terry Haist testified that he was living at the Sloop home with his fiancée, Amy Sloop, in 1996. He knew defendant as Rachel's boyfriend. Terry had a 20-gauge single-shot shotgun that he kept under the bed in Amy's upstairs bedroom.

He also testified regarding the relationship at that time between his sister, Kim, and her former boyfriend, Terry Hamelton. There was some "squabbling" between Kim and Terry Hamelton over the children. Terry Hamelton resented Terry Haist because he was "more or less like a father figure to the kids." Hamelton had made comments about coming for Haist and wanting "a piece" of him. Terry Haist was told by defendant that Hamelton had been taking target practice, making Haist believe that Hamelton was going to come looking for him. Every time defendant was at the house, he would make comments to Haist about "what Terry Hamelton was doing."

On the afternoon of July 8, 1996, Haist was at the Sloop house while Barbara Sloop was cooking dinner. Everyone, including defendant, was talking "about how everybody was scared about all the events that were going on. And Amy wanted her mom to lock all the doors." Defendant said that if someone really wanted to get into the house, they could just come in through the window, pointing at the window in the dining room.

On the evening of July 8, 1996, Haist and Amy did not stay at the Sloop home because Amy was afraid that Hamelton "was going to show up and try to do something." They went into town to stay with his grandmother. He left the shotgun in the bedroom, sticking out from under the bed so that he could have easy access to it. The shotgun was not loaded.

Haist further testified that he had shot the shotgun with defendant on at least five occasions. They shot birds and took target practice.

-12-

Once, defendant brought his own shotgun shells so that he could take target practice while Haist was gone.

Kim Haist's previous sworn testimony was read into the record by another person. She had testified at the first trial that on July 8, 1996, defendant drove her and her two small children from their apartment in Carthage to the Sloop home. Her car had been set on fire at her home several days before and she suspected that Terry Hamelton, the children's father, was responsible. She knew defendant through the Sloop family and he had stayed at her apartment for several nights to protect her and her children.

After they dropped the children at the Sloop home and arranged for Lonna to watch them, defendant took Kim to run several errands in town. They returned to the Sloop home at about 4 p.m. and visited for a while. When they discussed the recent fire, the discussion turned to the need to lock the doors when everyone went to bed that night. Defendant said that it would not matter if the doors were locked, because someone who wanted inside could come through the windows.

When it was time for defendant to leave, he offered to drive Kim's younger sister, Michelle, to her boyfriend's house in Keokuk, Iowa. Michelle and defendant left the Sloop home together. Terry Haist and Amy Sloop also left for the night because Amy did not feel safe. Then Kim and Barbara Sloop went back to Carthage to retrieve clothing and toys for the children, returning at about 10 p.m. After they watched the television news, everyone went to bed. Barbara woke her at 11:30 p.m., to tell her that defendant had phoned to say that they needed to go to her apartment in Carthage because Terry Hamelton had been arrested while ransacking her apartment and that the police needed to speak to her. When they arrived, they saw no lights and no vehicles. They went to the police station and Barbara attempted to call home. When there was no answer, a county sheriff's deputy was sent to the Sloop home. At the request of the police, they remained at the police station until 6:30 a.m. the following morning. The next time she saw her children was in the trauma unit of the local hospital, before they were airlifted to Peoria for treatment.

Police Captain Kevin Church of Keokuk, Iowa, testified that when he was a patrol officer in 1992, he investigated a report of a young man who approached the manager of a cemetery, asking alarming

questions about security there. He had shown her a police badge and stated that he was doing security work for the police department. Church identified defendant as that young man. Church and another officer went to the Ramsey home, spoke to defendant's father, and searched defendant's bedroom, where they found a police badge. Defendant's father told Church that he had found some stolen items in the attic of his garage and had discarded them. He gave the officers permission to search the garage and they found a 9-millimeter handgun. Church asked that defendant be brought to the police station, where he was given *Miranda* warnings and made a statement, admitting that he had gone to the cemetery and spoken to the manager. He also admitted stealing the handgun from a neighbor's home. Church also testified that he had arrested defendant on more than one occasion prior to this incident.

Amy Mitchell Briggs testified that in 1993 she had been the girlfriend of Shane Mullenburg. She knew defendant from school and from seeing him around town. On October 11, 1993, she and Shane left his house to go out for the evening. She had forgotten something, so they returned to the house where they found defendant and another young man whom she identified as Dustin Wade. One of them was holding a VCR. They went out through the front door and she chased them. She could not recall if Shane owned a gun at that time.

Barbara Sloop returned to the stand to read a victim impact statement regarding the death of her daughter, Lonna.

Thomas Crew, chief of police for the City of Keokuk, Iowa, was the next witness for the State. In 1993, when he was a criminal investigator, he investigated the burglary of Shane Mullenburg's home. The police could not locate defendant, but they did speak to Dustin Wade, who explained that the burglary was defendant's idea and that defendant was looking for a gun. He said that when they were interrupted by Briggs's return, the gun was left on a bed.

Crew also testified that he was familiar with defendant, who was a "common figure" in the community and who frequented the fire department and police department on a regular basis. He was "always there" and was fascinated with anything having to do with radio equipment or emergency services.

In 1994, Crew was part of a task force that was conducting

-14-

undercover narcotic operations. The members of the task force used radios to communicate during surveillance. At one point, Crew was sent to do a "buy bust" at a local hotel. As he was driving an unmarked car to the hotel, he saw defendant on the street talking to a relative of the target of the operation. As Crew drove by, defendant pointed him out to the person to whom he was speaking.

That individual later complained to the police department that he and his family were being surveilled by the police. An investigation revealed that defendant had recorded task force radio transmissions. Upon learning that the task force's radio frequencies had been compromised, Crew obtained a search warrant for defendant's school locker and his residence. In his bedroom, police found a Rolodex file containing information regarding police officers and their families, including home addresses and names of their children and spouses. The file contained similar information regarding firefighters and emergency management personnel. Defendant was charged with interference with official acts.

Dr. Christopher Hefner testified as an expert witness. He testified that he treated Rachel Sloop for a gunshot wound to the head. The bullet struck and entered the first cervical vertebra and both the bullet and the bone were fragmented. There was no exit wound. The injury resulted in complete occlusion of the right vertebral artery, which supplies the back part of the brain. Although Rachel was able to speak and her vision and facial functions were normal, this injury presented a risk of a devastating stroke due to formation of a blood clot. Dr. Hefner elected to use blood thinners to treat the clot, rather than surgery, because of the risks involved in surgery. Rachel's injury was potentially life-threatening.

Retired Illinois State Police officer Stuart Erlenbush testified that he had been present on the morning of July 9, 1996, when defendant was taken into custody. He observed what appeared to be a superficial gunshot wound to the back of his head. There was some blood, but no sign of a puncture wound. The wound was treated by applying gauze with tape.

Dan Law of the Illinois State Police testified over a continuing objection by the defense to any mention of the attempted murders of Cody and Courtnie Hamelton. Law stated that he responded to the Sloop home on the night of July 8, 1996, as a member of the tactical

-15-

response team. After donning protective gear, the team approached the house from the rear. As they did so, two individuals exited through the front door. The team then entered the house. Law went to the second floor and entered a bedroom in which he found a small boy, lying on the floor with a blanket and pillow covering his face. Law removed the blanket and pillow and then began removing his equipment so that he would not alarm the boy. He did not initially observe any injuries, but saw the child's skin turn an ashy color. His condition seemed to be deteriorating. When medical personnel arrived and moved the boy, Law observed a wound in his back. While he was tending to the boy, Law heard a gasp from the corner of the room. He looked over to see a small girl lying on the floor. One of her eyes was "bulged out enormously" and there was dried blood on her face. When the EMT tried to insert an IV in the girl's arm, she began screaming. Once the boy was removed on a backboard, Law carried the girl to the waiting ambulance. Law returned to the house through the front door and observed the body of another girl lying on the couch.

Illinois State Police master sergeant Bruce Liebe also testified over a defense objection regarding the discovery of the injured children in the upstairs bedroom. Liebe stated that he saw the two children lying on the floor. The girl was face down and he initially thought she was dead. The boy was lying on his back, with a pool of blood around his head. He was obviously frightened. Liebe got down on the floor and began removing his mask, goggles, and other equipment. The boy calmed down. He was alert and responded with eye movements, but he did not speak. At this point Law realized that the girl was still breathing. He observed what appeared to be a gunshot wound to her right eye. Initially, he could not tell whether it was an entrance wound or an exit wound. Later, he discovered an entry wound to the back of her head. The girl seemed to be unconscious, but reacted when paramedics attempted to insert an IV. Then the boy became unresponsive and his color turned ashen. He appeared to be going into shock. When the boy was being moved to a board, Liebe observed a bullet wound in his "upper shoulder area alongside of his spine." Both children were then removed to waiting emergency responders.

Dr. William Hanigan, a neurosurgeon, testified as an expert witness regarding his treatment of Cody and Courtnie Hamelton. When he first saw Courtnie in the emergency room, she was

semicomatose. A CT scan of her head showed bone and bullet fragments along the right side of her temporal lobe to the right eye, along with a blood clot. He performed surgery to remove the fragments and injured brain tissue. Courtnie's right eye was "destroyed."

Hanigan saw Cody Hamelton for the first time the following day. The bullet wound through his shoulder damaged his esophagus, which required surgery to repair. He later developed a bacterial infection at this site. The bullet also fractured cervical vertebrae and injury to his right brachial plexus, which supplies nerves to the arm. Cody was not able to move his right arm and was barely moving his right leg. A second surgery was required to remove dead tissue in the shoulder. During this procedure, the doctor performed a spinal tap, which revealed meningitis.

Captain Tim Becker of the Illinois State Police testified that he had been a trooper in 1996 and that he was the individual who placed defendant in handcuffs after he exited the Sloop home. He observed that defendant had blood on his hair, face, and clothing. Another trooper read defendant the *Miranda* warning. Defendant acknowledged that he understood his rights. He was "shivering; shaking violently; crying; saying he was sorry." On cross-examination, Becker acknowledged that defendant shed tears and that he said he was sorry more times than Becker could count.

Ron Wood testified that he was a juvenile court officer in Keokuk, Iowa, and that he had held that position since 1985. He first encountered defendant in 1992, when he was charged with fourth degree theft for stealing a gun. He was adjudicated delinquent, placed on probation, and ordered to comply with certain conditions including attending school, making restitution, performing community service, and obtaining counseling.

Wood next encountered defendant in 1993 after he was charged with fourth degree theft, assault, fifth degree theft, assault doing bodily injury, and third degree burglary. The charges stemmed from five separate incidents. Wood recommended that defendant be placed in detention. After a hearing, he was ordered placed in detention in the juvenile facility at Montrose, Iowa.

Defendant later admitted the delinquent acts of theft and assault.

The court placed custody of defendant with his parents and sister for the purpose of placing him in an "appropriate structured residential facility," which Wood described as "group care." He went to a home in Davenport, Iowa, where he attended school and obtained family and individual counseling. He remained there from November 1993 to August 1994, when he was released by consent of all parties, including the State's Attorney. He remained on probation.

In December 1994, while still on probation, defendant was charged with interference with official acts and harassment of a public official. After a hearing, his probation was revoked and he was placed at the State Training School for boys at Eldora, Iowa, which is the state's juvenile prison.

On cross-examination, Wood acknowledged that defendant admitted guilt each time he was accused of a crime. In addition, a psychiatrist at the State Training School prepared a report, which was submitted to Wood, in which he diagnosed defendant with Attention Deficit Hyperactivity Disorder (ADHD) and recommended that he be referred to a mental health center for treatment with medication. Wood agreed with his recommendation that defendant be placed in a highly structured group home upon his release from Eldora. This recommendation, however, was rejected by the committee responsible for such decisions and the defendant was instead sent home "with services."

Wood was also questioned on cross-examination about the circumstances of the December 1994 charges. Defendant entered an electronics store in Davenport, Iowa, and claimed to be a member of the West Point fire department. He attempted to buy the type of radio used by the department. The clerk became suspicious and refused to make the sale. The clerk took down the license plate number of defendant's car and reported the incident to the sheriff.

Wood's cross-examination was also used to admit defendant's discharge summary from Eldora, which indicated that he had been a productive student, taking a vocational course in residential wiring, that he had completed his GED requirements, and that he was enrolled in a computer literacy program.

On redirect, Wood testified that defendant served multiple in-school suspensions during his eighth-grade year, 1991-1992, for

offenses such as hitting, kicking, and pushing other students and possession of keys to the school building. Except for a B in physical education, his final grades were Ds and Fs. In 1992, when Wood first dealt with defendant, he had not previously been charged with any crime. However, he told Wood that he had been involved in numerous thefts in the Keokuk area. The records provided to Wood revealed that prior to the incident involving the cemetery and the theft of the gun, defendant was seen by a clinical psychologist who diagnosed him as having oppositional defiant disorder. In addition, the doctor who diagnosed the ADHD condition found "no evidence for any serious mental disorder which would impair [his] ability to be responsible for his behaviors." Records from defendant's stay at the group home in Davenport showed that he had a "superficial commitment" to the program there and that he "demonstrate[d] a false commitment to the program." He denied and minimized the conduct that resulted in his placement there and did not accept responsibility for his actions. Further, he interacted with his peers in a "domineering and superior manner." He also had an "unrealistic concept of boundaries between himself and authority figures." Wood read and relied on these reports and records to make his recommendation regarding placement of defendant.

In 1994, after the incident in which defendant interfered with the work of the drug task force, a search warrant was executed on his locker at school. The search disclosed a confidential list with unlisted telephone numbers at the school. Based on his possession of this list and his excessive absenteeism, he was suspended from high school. Defendant's father thereafter contacted Wood to tell him about the suspension and to report that defendant was not following his curfew. His father was concerned with recent outbursts of defendant's temper and feared that he might physically hurt his mother. Wood's testimony also revealed that defendant's parents were, in fact, his biological grandparents who had adopted him as an infant.

Dr. James E. Coeur was unavailable to testify. His testimony from defendant's first trial was read into the record. Dr. Coeur testified that he treated defendant on July 9, 1996, for a superficial wound to the back of the scalp. An X-ray revealed no damage to the skull. The wound was a "groove" in the soft tissue of the scalp, about 4½ inches long and half an inch wide. He used a local anesthetic and sutured the

wound. Defendant was calm and cooperative.

The videotape of the statement defendant made to the police on the morning of July 9, 1996, was admitted into evidence via the testimony of William Pententler of the Illinois State Police, who was present during the interview. The tape was played for the jury. Its contents are summarized above.

The State's case in aggravation closed with the testimony of Suzanne Marson, who read a victim impact statement regarding the death of her daughter, L.M.

Capital Sentencing Hearing–Evidence in Mitigation

Mark Cunningham, a clinical and forensic psychologist, testified as an expert witness that he is familiar with scholarly research regarding the likelihood that a capital defendant will commit serious violence while in prison. He authored a number of articles on this topic, for which he received several awards. Cunningham interviewed defendant for 1 hour and 40 minutes in August 2006. He also interviewed two corrections officers from facilities in which defendant had been confined regarding their observations of him, and he reviewed defendant's records from these facilities. In addition, Cunningham utilized statistical and demographic information regarding inmates who commit crimes while in prison.

Cunningham opined that there is a "very low likelihood that Dan Ramsey would commit an act of serious violence or seriously injury somebody while confined for life." This conclusion was based on defendant's age (29 at the time of his evaluation), the appraisal of correctional staff, the fact that he holds a GED certificate, and the fact that he has regular visitation with his family. In addition, "in his interpersonal style, he is significantly detached from inmate interactions." Cunningham also noted that defendant had no disciplinary tickets for threats, fights, or assaults while in prison. Cunningham further noted that the data shows that severity of the offense that sent an individual to prison is not a predictor of violence while in prison. He also testified regarding the conditions in Illinois prisons for individuals serving life sentences without the possibility of parole.

Jana Huele testified that she is defendant's biological mother and

his adoptive sister. She was 16 years old when defendant was born. Her two older sisters and older brother had left home by this time, so she was the only child living at home with her parents. She concealed her pregnancy from her parents until a few hours before giving birth. She received no prenatal care. She originally intended to give the baby up for adoption, but decided the morning after his birth that she wanted to see him. The nurse brought her an infant, with whom she spent several hours. After she went home with her parents, she realized that their description of the baby's red hair did not match the infant she had seen. When the social worker came to the house for her to sign the consent papers, she insisted that she could not sign the papers without seeing her baby.

The social worker brought the infant to the Ramsey home. Jana and her family, including her parents, her grandmother, one sister, and her brother, spent several hours with the infant. When Jana announced that she wanted to keep the baby, the family was "very happy." The social worker took the child back to the foster parents, over her objections. He was not returned to her for a week and a half or two weeks.

Jana went back to school while her mother cared for the baby. The crib was placed in her parents' bedroom and her mother got up with the baby at night. Eventually, her parents suggested that they adopt the baby and she agreed. The adoption was final just before his first birthday. When she was 17, Jana married Mark Huele and moved out of her parents' house.

Jana did not necessarily agree with her parents' decision not to tell defendant the circumstances of his birth and adoption until he was in his teens, but she and the other family members went along with the decision. However, when defendant was about nine years old, Jana's oldest sister began to drop hints that his parents were really his grandparents. The sister was then divorced and living at home and Jana felt that she was jealous of the amount of attention her parents paid to defendant rather than her own children. After defendant found out that he was adopted, he began to rebel. He was angry and began to get into trouble. Over time, it became more difficult for her parents to discipline defendant. She and her siblings could not tell their parents about anything defendant said or did, because they would not have believed it. Her parents thought that their children and grandchildren

were jealous of defendant and tried to get him into trouble.

At age 11 or 12, defendant became very interested in listening to the police scanner. He would keep track of calls and would ride his bicycle to watch what was going on. He equipped his bicycle with a light and some sort of siren and carried the scanner with him.

Edna Jean Daggs testified that she had been defendant's kindergarten teacher. She noticed that defendant was immature and had a difficult time staying on task. She had a hard time getting and then holding his attention. She discussed the situation with defendant's parents, who declined to give permission to have him tested. At the beginning of the school year, routine speech, hearing, and vision testing was done. Defendant's parents would not give permission for additional testing or the speech therapy that was recommended as a result of the screening. During the first semester, defendant did not learn to write his name and he did not learn to recognize any sounds associated with letters of the alphabet. Daggs later sent home another request for special education support services for defendant's parents to sign. Instead, they withdrew him from school.

Defendant's kindergarten grades were admitted via Daggs's testimony. In addition to the report card she gave, which stated that he was not making progress, talked constantly, and had a very short attention span, the physical education teacher reported that defendant experienced difficulty with jumping, skipping, hopping, galloping, and marching. He had difficulty identifying parts of the body and naming animals.

Phyllis Benner testified that she was defendant's teacher for the remainder of kindergarten after he transferred from public school. He had to repeat kindergarten because he had not yet begun to read. He attended the same school for first through fourth grades. Defendant was "a loner." He did not have any friends at school. On show-and-tell days, he would bring keys to school. He would take his ring of keys out on the playground and try to tell the other children what he could open with them. He was disappointed that they were not interested.

Kathleen Carter testified that she had been defendant's sixth-grade teacher at another private school. As a transfer student in fifth grade, he had a hard time fitting in. He was a C or D student in her class. She thought he would benefit from speech therapy and she referred him to

the speech teacher. The principal signed off on her recommendation and defendant's mother consented to the initial evaluation. However, she refused permission for him to attend speech therapy.

She further testified that defendant had difficulty paying attention, that he was easily distracted by the sound of a truck going by or even a lawn mower outside. He did not regularly complete his homework. He got into scuffles on the playground and in the lunch room. Defendant complained that other students picked on him and teased him. For example, he would bring a badge that he had made to school and tell his classmates that he worked for the FBI. He also brought toy handcuffs to school. He carried a briefcase instead of a backpack like the other students. She saw defendant carry a key ring with 20 to 25 keys on it, which hung from his belt loop. He liked to show them off and tell people what he could unlock.

Doris Turner testified that she had been defendant's seventh- and eighth-grade mathematics and science teacher at a Catholic junior high school. She observed that defendant was not "able to interact with the other junior high students in a way that [she] would expect a seventh grade student to interact." Thus, when assigning students to work together in lab groups, she had to select a partner for defendant who could communicate and work with him. He was not able to "banter" with the other students and took things that they said "very literally." His feelings were easily hurt and she saw him "tense up," "become rigid," and have tears in his eyes when this happened. He had no close friends among the other students, but did stay at school after hours, as if school were a "safe haven" for him. "One-on-one, with an adult," he was "fine." He was very helpful to the teachers and offered to do chores such as sweeping and moving equipment.

Turner observed defendant regularly carrying a key ring with as many as 100 keys on it. He was fascinated with law enforcement and he would "hop on his bike after school" if he heard a siren. He was "always talking" about one particular police officer and often wanted to tell her about things that had happened with the police in town.

Jack Turner testified that he had been the principal of the Catholic school defendant attended. He found defendant to be "personable" in a one-on-one conversation. He was "very, very, very infatuated" with what the police and fire department were doing. However, he was "kind of a loner, had not matured socially, and as a consequence,"

Turner thought, he "had a tendency to try and get attention, sometimes negatively." Defendant was frequently given detention. Turner observed no close relationships between defendant and other students. He sometimes saw defendant trying to join a group of students in conversation and being rebuffed. Defendant would be "very hurt," and he "did not accept rejection very well." He participated in no extracurricular activities, but readily volunteered to help the teachers.

The situation with defendant deteriorated during his eighth-grade year. Money was missing from the locker room, from bingo receipts, and from the office. Turner suspected defendant. Defendant was finally caught with "a whole pocket full of keys that belonged to the school building" as well as keys to multiple pop machines at the school and elsewhere.

Turner took the matter to the school board, in a meeting that defendant's parents attended. Turner's position was that defendant should not stay at the school unless he received "professional help." He recommended the Newman Center in Quincy, Illinois. At the end of the meeting, defendant's parents knew that if they took defendant to the Newman Center or a similar facility for treatment, he could come back to the school. Shortly thereafter, Turner received a request to transfer defendant's records to a public junior high school.

Nancy Clemonson testified that she had been employed as a school counselor at the Catholic junior high school defendant attended. She first met defendant after an "altercation," in which he wielded his briefcase against other students. She spoke to him about appropriate behavior with other students. Later, she recommended to defendant's parents that he receive counseling because he was getting into fights at school.

Linda Burdette testified that she was defendant's biological aunt and adoptive sister. She had given birth to her first child, a son, six months before defendant was born. She had not been aware that her teenage sister, Jana, was pregnant. Jana had lost some weight earlier and Linda thought she was just gaining the weight back. Jana had no prenatal care. She did not take prenatal vitamins. During the pregnancy, she "smoked like a chimney" and "drank a lot of Pepsi," because she did not like milk. Linda urged her sister to give the baby up for adoption, but encouraged her to see him before making her

decision. Jana was "very angry" that the hospital initially substituted another baby for her to see. Linda did not think it was a good idea for her parents, then 49 and 50 years old, to adopt the infant. She and her husband considered adopting him, but did not feel that they could afford to care for another child.

Linda explained that her parents intended to tell defendant that he was adopted, but that they wanted to choose the right time. The other family members were aware of her parents' insistence that they be the ones to tell defendant the truth, but they "just kept putting it off and off and off" until it was "too late." When defendant was about eight years old, the oldest Ramsey sister, Debbie, told defendant that he was adopted. He has since refused to reveal what she told him or the circumstances, but he was very upset. Debbie was very jealous of defendant and Linda opined that she "didn't tell him very nicely."

After learning the circumstance of his birth, defendant tried to form a closer relationship with Jana, his birth mother, who lived nearby with her husband and four children. Her husband "didn't care for [defendant] at all" and did not want him around. Her children were jealous of him. In the end, he was not "welcome" at Jana's home.

In addition, defendant lost trust in his adoptive parents. Linda tried to talk to him and to tell him that he was loved, but he ignored her. His behavior changed and he became rebellious.

She then spoke about his fascination with keys, radios, and electrical equipment. Once she cleaned her parents' house for them and she found keys and key rings hidden in the curtain valances and other places. He had "stuffed keys all over the house." He was also fascinated with the police scanner and hand-held radios.

Shortly before the events of July 8, 1996, defendant came to Linda's house to talk to her about his breakup with Rachel Sloop. She spent about an hour talking to him. He wanted advice on how to reconcile with Rachel and said that he intended to buy her a gift. Linda advised against it, explaining that he could not "buy" love. Instead, she recommended that he write her a card or letter explaining his feelings. He came back to see her on July 3, 1996, and told her that he bought a ring for Rachel. Linda was busy preparing for the holiday, and did not give him the time and attention he needed.

Linda stated that she visited defendant in prison once a week and

that she once asked him how he felt about what he had done. He became very upset with her questioning him about his remorse and said that he thinks about what he did "every day."

Roy Bell testified that he was a paramedic in Keokuk until 2002. He stated that when he was on ambulance calls, defendant would "come and see if we needed any help." Sometimes defendant would arrive at the scene before the ambulance. Defendant also came to the garage where the ambulances were housed. Bell would occasionally allow defendant to get equipment from the truck or to help lift a patient on a backboard. Bell encouraged defendant to take the test to become an EMT.

Richard Marlin testified that when he was employed as a juvenile court specialist in the early 1990s he twice supervised defendant when he was ordered to perform community service. Groups of young men would be assigned to pick up trash or set up tents for community events. Defendant was a hard worker. He followed instructions and never complained about the work. Unlike some of the other young men, defendant was always on time. Marlin stated that he could not turn his back on defendant because the other boys would "knock him upside the head." They did not like defendant, who had problems fitting in. If Marlin had to leave the work site, he had to take defendant with him because the other boys "would do something to him."

Dr. Ruben Gur was accepted as an expert witness in the fields of psychology and neuropsychology. He provided a lengthy description of the structure of the brain, the functions of the various portions of the brain, and how the brain develops.

Dr. Henry Conroe was accepted as an expert in the field of psychiatry. He testified that he was asked to evaluate defendant to determine if he had any mental disorders that might have affected his behavior in July 1996. He reviewed records regarding the crimes including defendant's videotaped statement to the police, records of interviews with people from the community, and defendant's medical and school records. He interviewed defendant for a total of 9½ hours over a period of several years. He also interviewed defendant's adoptive parents, his biological mother, and his adoptive uncle.

Conroe observed that defendant had "difficulty explaining his

emotions" and that when he did talk about his feelings, there was a "disconnect" between his facial expression and what he was saying. He assigned four diagnoses to defendant: "Asperger's Syndrome," "Borderline Personality Disorder," "Attention Deficit Disorder," and a history of "Conduct Disorder."

He described Asperger's Disorder as a "mild form of autism," which consists of two findings. First, these individuals are unable to "read" other people's emotions or cues. As children, they have problems with their peers and, as adults, they have difficulties in relationships. Second, individuals with Asperger's Disorder tend to have an "intense preoccupation with a very narrow idea *** to the exclusion of other activities." They will be "very focused" on this one idea and "spend tremendous amounts of time over a long period of time" pursuing it. Asperger's Disorder was first recognized as a diagnosis in 1994.

As to the second finding, Conroe found that defendant was fascinated with communication equipment, particularly as related to police, firefighters, and emergency responders. His family reported that this interest began when he was only seven or eight years old. His brother provided a file that defendant kept as a teenager in which he recorded names and information regarding people in the community. At that age, he saw himself as "being an officer in some sort of security company." He described defendant's interest as an "intense preoccupation."

As to the first finding, Conroe stated that defendant's family members described his difficulty reading their feelings. He did not relate well to other children, but did better with adults because they were more patient with his difficulties. The school reports that Conroe reviewed were consistent with this finding. Defendant was described as easily upset, mumbling to himself, and having social problems. His teachers also observed that he was "preoccupied with gadgets" and that he carried an "FBI badge," which was actually an old calculator case. One teacher described defendant as "confused" and "sad" and having a "short fuse." She said he was "very sensitive to rejection" and she considered him "a disaster waiting to happen."

A person with Borderline Personality Disorder, Conroe explained, feels abandoned and, thus, rejected. Such a person has unstable moods, is impulsive, and may have a problem managing anger. In

addition, the person may have "two conflicting aspects of themselves." In defendant, Conroe observed five of eight diagnostic criteria for this disorder, which is sufficient to make a diagnosis. At a young age, he learned that he was rejected by his birth mother and adopted by his grandparents, causing his sense of abandonment. At this time in his life, there was a "significant deterioration in his behavior," including increased anger as reported by his family members and his teachers. His confusion about his family relationships–learning that the people he believed to be his parents were his grandparents and that his sister was really his mother–"could, in a vulnerable individual, cause a great degree of confusion about who and what they are." His emotions were "very easily set off." For example, his reactions to the breakup with Rachel Sloop included depression, anger, and tears. Defendant himself described this period as a "roller coaster." The two letters that defendant wrote to Rachel prior to the offenses but did not send to her revealed feelings "of rejection, anger, suicidal thought, and abandonment." The letters were admitted into evidence.

Attention Deficit Disorder (ADD) is seen in children who have difficulty focusing in school. They are easily distracted and have problems organizing their behavior and completing tasks. ADD leads to stress, low self-esteem, and compromised problem-solving ability. Treatment may include medication, counseling, and special education. The condition may persist into adulthood. Records from several schools and from the Eldora facility described defendant in these terms. While in school, he was evaluated for ADD, but he never received treatment.

Conroe also reviewed defendant's medical records, including the record of his birth, which showed that his teenage mother had received no prenatal care.

An intake assessment from the River Center for Community Mental Health, dated December 9, 1991, described defendant at age 13. A psychologist noted that defendant had problems with anger and peer relationships, particularly after learning that he had been adopted by his grandparents. He got along with older people, but not others his own age. Conroe described this as "typical of Asperger's." His adoptive parents described him as having few friends and said that they did not know what would "provoke him." He was not physically violent, but would become "very verbally angry." Defendant told the

psychologist that he wanted to be a police officer or a firefighter.

A report from a psychologist who treated defendant supported Conroe's diagnosis of Borderline Personality Disorder. The psychologist stated that defendant liked to talk about listening to police scanners and being around policemen, but that he became "quite uncomfortable" when asked about his discovery that he was adopted. According to Conroe, this showed "how emotionally charged this was" for defendant and that he did not "have the ability *** to use that therapeutic session to handle the feelings."

In a later report, the same psychologist reported that therapy was being terminated because defendant's adoptive mother was unable to afford further treatment. Defendant was disappointed and stated that he had become "really comfortable" with the therapist. He tried to persuade his mother to change her mind. In the psychologist's opinion, the mother felt threatened because the therapy had begun to focus on defendant's lack of a relationship with his birth mother. At the end of the session, defendant was close to tears and "trying hard to stifle his emotions." Conroe opined that this record showed defendant "had some ability to make use of a therapist," but that "external circumstances interrupted therapy."

In 1992, a psychiatrist at the State Training School in Eldora, Iowa, diagnosed defendant with ADHD and Undifferentiated Conduct Disorder. He recommended treatment for the ADHD with a stimulant, such as Ritalin. The report also described defendant as being "very immature" and as having difficulty "establishing and maintaining appropriate relationships with peers." His IQ was within the average range, but he was "inept socially, attention seeking," and his behavior was "a little odd." One worker at Eldora said that defendant did not learn from his experiences with his peers. For example, he would continue telling his stories even after his peers would tell him that they did not want to hear any more. Conroe said that this behavior is "very characteristic of someone with Asperger's. They don't get the clues or the cues from other people." The report from Eldora concluded that defendant would benefit from a "highly structured program."

Conroe concluded that on July 8 and 9, 1996, the disorders he diagnosed had "an extreme affect" on defendant. They affected his ability "to make judgments, to manage his feelings, to make decisions, to deal with the feelings that were welling up within him that were

[described] in these two notes" that he had written to Rachel. "So he was under extreme duress at that point from these disorders."

Defense counsel asked Conroe whether these "mental disorders" could also be characterized as "mental disturbances." He answered, "Yes." The State objected and the court instructed the jury to disregard the question and answer.

Conroe opined that defendant was remorseful for his actions, as shown in his videotaped confession and by the fact that he was "visibly shaken" when speaking to Conroe about the events. He did not try to "explain it away or rationalize it" or "make excuses."

On cross-examination, Conroe acknowledged that another psychiatrist, now deceased, had been hired by the defense to evaluate defendant prior to his becoming involved in the case. That psychiatrist did not diagnose defendant with Asperger's Disorder, Borderline Personality Disorder, or ADD. Instead, that psychiatrist diagnosed Antisocial Personality Disorder. Conroe was questioned regarding the diagnostic criteria for this disorder and whether defendant met these criteria.

The first criterion is failure to conform to social norms with respect to lawful behavior as indicated by repeatedly performing acts that are grounds for arrest. Conroe admitted that defendant meets this criterion. The second criterion is deceitfulness as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure. Conroe acknowledged that defendant displayed some of this behavior, but "not in a pervasive manner which is necessary for the diagnosis to be made." He also noted that defendant has been incarcerated since the crimes and has not committed any antisocial acts while in custody. Conroe agreed that the third criterion, impulsivity or failure to plan ahead, was present but insisted that the fourth criterion, irritability or aggressiveness as indicated by repeated physical fights or assaults, had not been a problem since defendant's incarceration. He noted that fights are common in jails and prisons, despite efforts to control inmates. Again, with respect to the fifth criterion, reckless disregard for safety of self or others, Conroe's position was that defendant had not displayed this trait while incarcerated and that because the second, fourth, and fifth criteria were not "pervasive" in his conduct, even while in custody, the diagnosis of Antisocial Personality Disorder did not apply.

-30-

Conroe also acknowledged that violence against others is unusual in persons with Asperger's Disorder and that defendant's preoccupation with police communications and police procedure, while it could be seen as reflective of Asperger's, could also be seen as a means of acquiring information that would be useful in committing crimes.

Dr. Terry Killian testified as an expert in the field of psychiatry. He explained that he had initially been contacted by the prosecution to evaluate defendant, but had been called to testify by the defense. Prior to meeting with the defendant in February 2003, he reviewed police reports related to the crimes, reports of interviews with witnesses, school records, and records from the various facilities and programs that had been involved with defendant. The interview lasted for four hours. His primary diagnosis was ADHD. He also diagnosed a past history of Conduct Disorder, explaining that the diagnosis, by definition, applies only to patients under the age of 18.

Killian explained the difference between ADD and ADHD. Not all children with ADD are hyperactive. Boys are more likely than girls to have ADD and are more likely to be hyperactive. In his opinion, defendant's records described a child with ADHD, despite no diagnosis being offered until his teen years. He was never treated for ADHD.

Several years after performing his initial evaluation of defendant, Killian was again contacted by the State and asked to review additional psychological and psychiatric reports regarding defendant. The files that he obtained at that time included reports of numerous interviews that he had not seen previously. He then interviewed defendant for a second time in November 2006. He diagnosed ADHD and a history of Conduct Disorder, but also diagnosed Asperger's Disorder and Depressive Disorder, not otherwise specified, probable Personality Disorder with dependent features, and Nonverbal Learning Disorder.

Killian described the diagnostic criteria for Asperger's Disorder including "qualitative impairment in social interactions," which may be manifested by: the marked impairment in use of nonverbal behaviors to regulate social interactions, the failure to develop peer relationships appropriate to the individual's age, or lack of spontaneous sharing of one's interests, activities, or achievements with others, and a lack of

social or emotional reciprocity. If two of these four manifestations is present, this criterion is met.

The records he reviewed, in his opinion, revealed that defendant manifested the second and fourth traits. He did not have age-appropriate friends because other children and teens saw him as "odd" and he lacked the ability to reciprocate socially or emotionally with others because he did not understand his own or other people's emotions.

The second criterion described by Killian was "repetitive and restricted and stereotyped patterns of behavior," manifested by any one of four behaviors: "an encompassing preoccupation with one or more activities that are abnormal in either their intensity or their focus," "inflexible adherence to nonfunctional routines or rituals," "repetitive motor mannerisms" causing "clinically significant impairment," or a "preoccupation with taking things apart." Killian opined that defendant had an "encompassing preoccupation" with "everything that had to do with police work and emergency services." A "lot of the trouble he got into during his teen years" was, according to Killian, related to this preoccupation. He described defendant's interest in these matters as "very significant and abnormal."

A third criterion, "significant impairment in social, occupational, or other important areas of functioning," was also met. Defendant was significantly impaired in his social interactions. Three other criteria were not applicable to defendant, but Killian stated that the requisite number of criteria were met to make the diagnosis of Asperger's Disorder.

After his 2006 evaluation of defendant, Killian wrote in his report that defendant had "Probable Antisocial Personality Disorder." He explained that "antisocial" means that the individual "violates other people's rights frequently and typically without remorse." He made the probable diagnosis because he found that defendant "without question" met the requisite number of criteria for the diagnosis. Defendant repeatedly disregarded and violated the rights of others starting by the age of 15; he was irritable and aggressive; he repeatedly failed to conform his behavior to social norms of lawful behavior; and he engaged in deceit. However, Killian noted, he did not see in defendant "what pretty much everyone I've ever read says is the core of the antisocial personality," that is, "the repeated violation of

other people's rights without remorse." Killian concluded that although defendant "technically" meets the diagnostic criteria, he has repeatedly expressed sorrow for the crimes and is "emotionally distraught" when he describes them. Thus, he stated, the diagnosis likely does not apply to defendant. He also observed that antisocial conduct does not cease merely because the individual is incarcerated and he noted that there were no reports of such conduct by defendant while in jail.

In conclusion, Killian opined that at the time of the offenses, defendant had all of these disorders and that his mental illnesses impaired his judgment. He had a "substantial disorder of thought, mood, and behavior," which caused him difficulty in recognizing his own emotions and those of other people.

On cross-examination, Killian acknowledged that at the time of the offenses, defendant was "not impaired by a psychiatric condition that would have made him unable to appreciate the criminality of his behavior." Further, he was "clearly able" to plan and make decisions and that he committed the crimes "out of anger." His Asperger's did not cause his anger or possessiveness of Rachel Sloop, but "played a role" although his "deficits were certainly not severe." He also acknowledged that defendant was not acting under any delusional beliefs or manic symptoms. He knew what he was doing, even though he was unable to describe why he did it.

Killian was also questioned regarding the records of defendant's psychiatric treatment while at State Training School. The psychiatrist there found "no evidence for any serious mental disorder which would impair his ability to be responsible for his behaviors." Another counselor described defendant as resisting treatment and seeing counseling as a "kind of game to see how long he could go without really telling the counselor anything."

The records reviewed by Killian also revealed that defendant described the mental health treatment he had received as a youngster as a "pain in the ass" and as a "game of cat and mouse." He did not feel that he had ever derived any benefit from treatment and said that he never felt the need for mental health treatment."

With regard to the Asperger's diagnosis, Killian agreed that this condition does not "make people particularly prone to committing

crimes." He stated that defendant's Asperger's is "relatively mild." A reasonable mental health professional could conclude that his symptoms, while present, are not sufficient to warrant the diagnosis. He noted that defendant's symptoms are "sustained," but are not "severe."

With regard to the Antisocial Personality Disorder diagnosis, Killian acknowledged that lack of remorse is but one of seven recognized symptoms and that an individual could be diagnosed with the condition if he manifested three of the other six symptoms. Thus, Killian explained, he qualified his diagnosis as "probable" and, if indeed present, the condition is "mild."

The final witness in mitigation was Joyce Ramsey, defendant's biological grandmother and adoptive mother. She testified that she loves her son, in spite of the "terrible thing" that he did, and that she visits him in jail once a week and speaks to him on the telephone two or three times a week. She regrets not having told him "right from the start" that he was adopted.


Capital Sentencing Hearing–Evidence in Rebuttal

Dr. Vallabhaneni, a psychiatrist, testified as an expert witness. He first interviewed defendant in August 1997, when he was a staff psychiatrist at Menard Correctional Center. He found defendant to be alert and oriented, with no sign of mental illness and no intellectual impairment. Defendant was coherent and cooperative. His mood, affect, and thinking were normal and he exhibited good communication skills. He did not diagnose any mental disorders, including ADHD.

On cross-examination, Vallabhaneni acknowledged that he had no independent recollection of his contact with defendant and that he typically spent 15 to 30 minutes evaluating a new inmate. He had no further contact with defendant after the initial evaluation.

Patrick Ewing, a clinical psychologist who treated defendant in 1992, testified as an expert witness. Defendant was referred for treatment after his release from the State Training School in Eldora. A psychiatrist there suspected that defendant had ADHD. Ewing testified that he did not diagnose defendant with ADHD because he did not see symptoms consistent with that diagnosis. He was

-34-

"interactive" and "cooperative." He was "open in providing information" and Ewing did not observe any indication of significant emotional distress or hyperactivity. Defendant told Ewing that he had been arrested for impersonating an officer. The "two main themes" they discussed were his anger at his father for allowing the search in which police found a gun defendant had stolen and the trauma of being told by a cousin that the people he believed to be his parents were really his grandparents. Ewing's diagnostic impression after his initial evaluation of defendant was Conduct Disorder, which is basically a descriptive term referring to violating the rights of others and of society's norms and rules.

Ewing saw defendant again a week later and again found him to be "very communicative" and "very interactive." He enjoyed talking about his interest in police work. He described his "being assigned some important position or status by people in the community." He had a strong interest in listening to police radio and "immers[ed] himself in that culture." During this second visit, defendant had a pair of handcuffs with him, which he "proudly displayed." Ewing attempted to obtain a release from defendant's parents to speak to a police officer who knew him because he thought the officer might be a resource to use in a positive way in defendant's therapy. Defendant became very angry at this suggestion and stormed out of the office.

Ewing's notes from their third session indicated that defendant was "a keen observer of many behaviors and situations when they relate to *** being in a position of power or control." Defendant used this information to present himself as being in a position of authority. At a later session, defendant brought a key ring with 35 keys on it.

Ewing noted that defendant was angry that his parents were imposing limits on his behavior and that Ewing was supporting and encouraging them in this effort. Defendant stated that he would not accept such limits.

Eventually, defendant's mother told Ewing she was going to move defendant to another therapist, citing financial problems. She also expressed her opinion that Ewing was being "unfair" to defendant because of the limits he proposed the parents set on his behavior. Defendant was upset about this decision. He was fighting back tears and said that he was going to talk to his mother about changing her decision.

Defendant resumed therapy with Ewing in August 1994, after he had been arrested for a break-in and sent to a residential facility. He had joined the school football team at the suggestion of his probation officer and was surprised at how well he got along with the other members of the team. He still did not want to talk about how he found out about his adoption and who his natural mother was, but was willing to discuss his dating relationship at that time. Ewing noted that social acceptance had been a very positive influence on his self-esteem.

With regard to Asperger's Disorder, Ewing testified that although he was familiar with the disorder, he had not been aware of it when he was treating defendant in 1992 through 1994. The diagnosis was not recognized until 1994. In retrospect, however, he did not believe that the diagnosis applied to defendant. The Asperger's patient has a difficult time reading other people, while defendant could "effectively con" people. Ewing described defendant at that time as being "pretty fluent in his interaction" with other people.

Mental health counselor Mike Maher testified as an expert witness. In 1992, Maher treated defendant at the River Center for Community Mental Health, after he was referred to the Center by the juvenile court office. Maher observed that defendant, who had previously been seen at the Center by another counselor, was "not overly receptive" to being there as a condition of his probation for theft. Defendant was 14 years old. At the initial interview his behavior was "grandiose and narcissistic." He had no difficulty communicating, but appeared to feel as if he were "above the law." At the same time that he was "preoccupied with police matters," he felt as if he could do things that were illegal. He was defiant and rebellious, perhaps related to his "family distress." Maher opined that defendant liked to push the limit "to see how far he could go, what he could get away with." Maher noted in his written evaluation at that time that while defendant did not "pose an immediate threat," "the potential for aggressive acts seemed possible given his ability to justify or rationalize the things that he was doing."

Maher noted "an open hostility towards both biological parents," with whom defendant did not want to have any contact. The information provided to him by the probation officer stated that defendant's adoptive parents were "intimidated and fearful of him, and

that he gets by with a lot of inappropriate behavior."

Maher had also reviewed the records from Eldora, which indicated that defendant was "shunned by his peers" there for his "grandiose and exaggerated stories/behavior" and that he had been caught going through a social worker's desk while at that facility.

Maher diagnosed defendant with Conduct Disorder, undifferentiated, moderate to severe, which he described as "a cluster of behavioral symptoms representing violations of age appropriate and legal societal norms." Except for the psychiatrist at Eldora who diagnosed defendant with ADHD, Maher was not aware of any other professional who had made that diagnosis.

The treatment plan that Maher developed for defendant in 1992 was admitted into evidence. This plan noted defendant's strength as his willingness to discuss his situation. His weakness was that "he saw nothing inappropriate or nothing wrong with his inappropriate and many times illegal behavior." In 1993, Maher documented defendant's progress. Defendant "continued to manifest oppositional behavior" and was unwilling to engage in treatment. In addition, there was a "lack of support from his grandparents to enforce behavioral objectives."

At the conclusion of one counseling session, Maher wrote: "Client is extremely manipulative and seeks to avoid responsibility for any of his behavior." At a later session, Maher observed that during their sessions, he and defendant "learned that a significant motivating factor for his decision making process is that anything providing him a sense of power or influence or authority over people is very alluring to him."

With respect to Asperger's Disorder, Maher testified that he was familiar with the diagnosis from his continuing education training and that he has seen children with this diagnosis. He stated that he could make the diagnosis, but that he saw "no evidence" of Asperger's in defendant.

Capital Sentencing Hearing–Sentencing

In its closing statement, the State urged the jury to focus on the "facts and circumstances of the defendant's horrible crimes" and the "many decisions and choices" that he made while carrying out his crimes. The prosecutor argued that the two mental health counselors

who best knew defendant, Maher and Ewing, rebutted defendant's mental health evidence. He noted that defendant brought a gun with him on the evening of July 8, 1996, and had it under the seat of his car when he went for a drive with L.M. That drive lasted only a few minutes–long enough to travel 1.6 miles–and ended when defendant pulled off the road near an empty grain bin that was surrounded by dense vegetation and then drove his car over 100 feet further off the road to park behind the bin. This, according to the prosecutor, was not "a haphazard, accidental, random thing." Similarly, defendant "very calculatingly and deliberately concealed her body in that grain bin off the road where she could not easily or quickly be found."

The prosecutor also questioned the testimony that defendant went to the Sloop home that night to commit suicide. If his intent was to kill himself, he would not have needed to scheme to get the adults out of the house. Rather, the prosecutor suggested, defendant's motive was to confront Rachel, to see if what Michelle Haist and L.M. had said about her feelings for him was true, so that he could decide if she deserved to die.

The prosecutor noted that defendant drove at a high speed to the Sloop home, so that he could be sure the adults had left. He turned his headlights off and waited by the side of the road "like a predator stalking his prey." This conduct was not "impulsive, random, crazy"; it was "calculating," "cold," and "methodical."

Further, if he had intended to commit suicide there, defendant would have simply pulled his car in the driveway. Instead, he drove 400 feet past the driveway and approached the house on foot, through a cornfield, bringing wirecutters and a flashlight. His cutting of the telephone wires was also inconsistent with his professed intention to commit suicide.

The prosecutor argued that after Rachel failed his test and he shot her, defendant shot Lonna Sloop because she could have identified him. Similarly, he shot the two children because they knew him and could have identified him, even though they had not seen him because they were in an upstairs bedroom.

Because defendant and Rachel had, by this time, seen the headlights of an approaching car, escape was not possible. His "half-hearted, lame attempt to supposedly commit suicide" was belied by all

of his "acts of planning *** concealment and deception" earlier that night. Further, his cooperation with the police was the result of his being caught "red-handed." There was "no mystery" about whom L.M. was with that night or about who shot four persons in the Sloop home. Thus, his cooperation with police was one more instance of defendant's manipulative conduct.

The prosecutor then summarized the statutory aggravating factors for the jury and argued that several of the factors were met. The prosecutor argued further that the evidence in mitigation should be given little weight.

Defense counsel began by explaining that mitigation is not intended to provide an excuse for a defendant's actions, but that such evidence should be used to determine whether death is the appropriate penalty. He urged the jury to focus not just on what defendant did, but on his life and on "what happened to him in his formative years that took him to that point." Defendant's expert witnesses established that he was "a mentally ill young man" and that his illnesses "impaired his judgment." He argued that the testimony of these board-certified psychiatrists was more credible than that of the State's witnesses.

Defense counsel also noted the decisions that affected defendant's life over which he had no control: his birth to a teenage mother who did not receive prenatal care, her reversal of her initial decision to give him up for adoption, his adoption by his grandparents and their decision not to tell him of his adoptive status, the manner in which he learned of his adoption, his parents' refusal to provide recommended speech therapy as a child, their refusal to give him recommended medication or to place him in the recommended treatment facility, and, finally, his removal from therapy with Patrick Ewing at his mother's insistence.

Counsel also emphasized defendant's acceptance of responsibility, including his guilty plea. In addition, counsel noted defendant's youth and the expert testimony that he was not fully mature when he committed these crimes.

After brief rebuttal by the State, defendant was allowed to make a statement. He expressed sorrow for his actions and for the pain he caused. He stated that although he could not change what he did in the past, he has since "tried to make the right decisions."

The jury was instructed and, after deliberation, rendered a unanimous verdict that death is the appropriate sentence. The court found that the record supported the jurors' finding and imposed the penalty of death. At a subsequent hearing, defendant was sentenced on the remaining counts. Defendant's posttrial motions to withdraw his guilty plea and to reconsider sentence were denied by the trial court after a hearing.

## ANALYSIS

### I. Applicability of Amended Supreme Court Rule 701

On July 11, 1996, the court appointed James Dennis to represent defendant, and Dennis continuously represented defendant throughout these proceedings. Defendant was also represented at his retrial by John Carter, who was appointed by the court in February 2001. Defendant first argues that he is entitled to a new sentencing hearing because neither of his trial attorneys were members of the Capital Litigation Trial Bar (CLTB). He points to Supreme Court Rule 701(b), which states in pertinent part: "However, no person, except the Attorney General or the duly appointed or elected State's Attorney of the county of venue, may appear as lead or co-counsel for either the State or defense in a capital case unless he or she is a member of the Capital Litigation Trial Bar provided for in Rule 714." 188 Ill. 2d R. 701(b). This requirement was added to the rule on March 1, 2001, by an amendment that also provided: "The amendment to paragraph (b) shall be effective one year after its adoption, and shall apply in capital cases filed by information or indictment on or after its effective date ***." Thus, the amended rule became effective March 1, 2002, and applies to all capital cases filed on or after that date.

Defendant was charged by indictment on July 9, 1996, and by amended indictment January 23, 1997. In February 2001, Judge Stephen G. Evans, who was then presiding and who had presided over defendant's first trial, contacted the attorneys for both defendant and the State. Judge Evans called the parties' attention to several recent news articles on the proposed creation of the CLTB. Although Judge Evans' letter indicates that he had not yet seen the proposed supreme court rule changes, he nonetheless expressed concern:

"While the Ramsey case was filed in 1996, I do not know

whether these rules are retroactive; however, with the strong policy positions taken in Illinois by the Governor, the Illinois Supreme Court, and the Task Force recommendations, I suggest that we take a very close look at the application of these new rules to this case.

As presiding judge at the first trial, I believe that all counsel performed very well. Based upon those observations, and what has occurred since the remand from the Illinois Supreme Court, I personally believe it would be in Mr. Ramsey's best interest to proceed with his present counsel. However, none of us want to participate in any error in the upcoming trial."

The court therefore instructed the attorneys to find out whether the proposed rule changes would apply to them and to take any necessary action: "I request that counsel promptly make inquiry as to how new Supreme Court Rule 714 may apply in People v. Ramsey. I also request that if applications for admission to the Capital Litigation Trial Bar are required, that same be pursued."

On February 23, 2001, at a hearing before Judge Evans, the judge again raised his concern about the forthcoming rule changes, indicating that he "would like to make a formal record at this time that would address the experience of counsel, and have that of record." The court then asked each of the attorneys present to recite his or her experience. After the State's attorneys had spoken, defense attorney Dennis told the court, "I have read some of the articles in the newspaper about the expected qualifications, and I believe I meet those qualifications." Dennis went on to explain that he had been practicing law since 1978, and he believed the new rules would require five years of practice experience. He also stated that he had tried "eight or more" felony cases before a jury, including the first trial in this case and one other murder case. Defense attorney Carter, who was then the chief public defender for McDonough County, Illinois, stated that he had been admitted to practice law in Illinois since 1982. He further stated that he "believed" that he had served as either co-counsel or lead counsel in more than five felony cases tried before a jury, although he could not remember precisely how many, and he had been "second counsel" in one murder case. Judge Evans responded that he believed Carter could meet the proposed rules' requirements

based on the cases Carter had tried before him alone. The court then found, "With respect to what has been recited by counsel, it appears that you all qualify under what I believe the terms will be of the proposed Supreme Court Rule for admission to the capital litigation trial bar. I do make those findings for the record at this time."

On November 21, 2002, the issue was raised before Judge William D. Henderson at a scheduling hearing. The State expressed continuing concern about the application of the amended rules to this case:

"Judge, there is one issue here that I would like to raise and that is in regard to capital litigation certification of the attorneys involved.

\*\*\*

And as we all know those new Supreme Court Rules are now in effect which require the certification of all attorneys. The statute, in my mind, clearly does say that it only applies to cases filed after the effective date.

However, in the last year and half or so, virtually every opinion coming out of the Supreme Court on a death penalty case has had a very strong dissent in which the two dissenting justices have indicated that if it were up to them they would reverse every case in which a non-certified defense attorney participated.

\* \* \*

Just this week 650 attorneys from throughout the state submitted a petition or letter to Governor Ryan urging that all cases be commuted, the 160 or so death penalty defendants, because of the fact that they were not tried with the present rules in effect.

\*\*\*

I think in the present situation with the death penalty I think it would be a smart move to simply have the attorneys on this case get certified prior to trial."

In response, Dennis told the court, "If this is a real issue for the State, and if the state's attorney agrees with 650 lawyers, one way to resolve it is to have the State take death off the table and \*\*\* and just try it as a regular murder case." The State indicated that it did not

intend to do so. The court then acknowledged that it had not considered the new rules in the context of this case, although "this case was filed well before the new rule." The court concluded that it would "take a look at it," but it instructed the State, "if you are going to attack the defense counsel on that basis, you should get a motion on file very quickly." The State responded that it had no intention of "attacking" them, but that it wanted to bring the issue to the attention of the court and the parties.

On January 16, 2003, the question came up again in proceedings before Judge Steven R. Bordner, who had been recently assigned to the case. Judge Bordner asked all of the attorneys whether they had become members of the CLTB, and upon finding that neither defense attorneys had, he said, "Counsel, I have not been confronted with circumstances in which we are this close to a capital trial in which neither counsel have been certified in this matter. Is it your intention, counsel, to be certified prior to trial?" Dennis responded, "Your Honor, I hadn't intended to do that. My understanding was because I was appointed and we had the case started prior to the new rules that wasn't required. No other judge that has been involved in the case has made it a requirement, and so I have not qualified." The court asked the parties to brief the issue, saying,

> "I would not want to repeat or replace any of these matters pending before the Court on a simple technical issue involving qualification of counsel.
>
> ***
>
> I would suggest, counsel, that if there is a significant question[,] that if you believe you would be certified by the Capital Litigation Committee[,] that you proceed with an application in order that that issue is finally resolved."

Counsel did not apply for membership to the CLTB. Instead, in a letter submitted to the court and dated January 22, 2003, defense counsel maintained that the amended supreme court rules did not apply to this case: "It is our position that the Supreme Court Rules requiring membership in the Capital Litigation Trial Bar do not apply to the Daniel Ramsey case, as the amended information in this case was filed prior to the adoption of the rule."

In a hearing on February 26, 2003, the court stated,

-43-

"The materials which were forwarded to me suggest that the rule, the Supreme Court Rule 701, applies to capital cases filed by information or indictment on or after the effective date of the rule which is March 1, 2001.

It appears further to the Court that these matters precede the effective date of Supreme Court Rule 701, and, thus, the application of the rule 701 is not appropriate to this case."

However, the State continued to express concern that neither Dennis nor Carter had applied for membership to the CLTB:

"The problem the People see, Your Honor, is that almost two years ago Judge Evans, who was the judge in this case at the time, brought this matter to counsel's attention. Two years have passed, and that's a substantial period of time for counsel to become members of the capital litigation bar.

They have not done so. And it concerns the People that in the event there would be a conviction in this case, in the event there would be a capital sentence in this matter on appeal that the appellate court would look at us in the year 2000–what we did in the year 2003, after this matter being around for so long, and wonder why counsel were not required to submit application to the bar.

And so we think that this is a matter that is important enough that it should be addressed before any other action is taken in this case.

* * *

And we think the opinion of the defendant is relevant in this matter. We think that [the amended rules] allow for the court to inquire of the defendant in this type of thing."

In response, Dennis explained that Judge Evans' 2001 letter had not asked counsel to join the CLTB: "It was obvious to me as a result of that letter that if we were required to [join the CLTB], then Judge Evans was directing us to do that. It then became obvious to Mr. Carter and myself that we were not required to do so." He also objected to the State's request to again document counsel's credentials:

"If the State is so worried about this case and our noncertification as members of the capital litigation bar, the

-44-

way we resolve it is to take that off the table. They have that in their power and they could do it. If this is a big problem that they have got an overwhelming concern of theirs unresolved, take death off the table, and there is no problem.

Now we are getting down to the last hour and all of a sudden it sounds like–if it's not directly a motion to remove attorneys, it's basically what they're wanting to do; or they are wanting the defendant to say, ['H]ey I want a continuance because now the State is making me afraid to go to trial with these attorneys.['] That's not fair.

And I don't think Mr. Ramsey has to be put on the record either. If he were wanting to represent himself then, obviously, he would have to put it on the record, but that's not the case. And I just think we are wasting the court's time."

After both parties had been heard, the court opined that the amended rules did not apply, saying:

"The Supreme Court, it seems to me and in conjunction with the legislative mandate has applied these rules prospectively and not retrospectively.

* * *

However, the Court will do two things to make a record in this matter. One, it will at this time make a finding that the attorneys in this case are experienced and have sufficient training to represent the Defendant in this matter so that a fair trial will result in this case.

And further, the Court will take judicial notice of this and the prior proceeding in which the qualifications of counsel were addressed either by way of letter, representation on the record or by way of other materials.

That is the basis for the court's finding in this matter that defense counsel are qualified to represent the defendant. The Court will further require that defense counsel supply an affidavit for the record in this matter which would generally outline their experience."

The court did not question the defendant about his counsel, noting,

"The Court will not do so because the defendant is not entitled to the attorney of his choosing. He is entitled to experienced and competent counsel. The court will make a finding that he has experienced and competent counsel; that Supreme Court Rule 701 does not apply retroactively; and to the extent that the defendant is not entitled to an attorney of his choosing; and the court having made that finding, his opinion is not controlling in this matter."

The affidavit detailing Carter's experience, filed March 14, 2003, indicated that he had been licensed to practice in Illinois since 1982 and in Missouri since 1988. He averred that he had never been disciplined in either jurisdiction, and that his performance had never been criticized by a reviewing court. Since his admission to the Illinois bar, he had spent more than four years as an assistant public defender in Knox County, Illinois, and he had been the chief public defender in McDonough County since 1989. In that time, he asserted, he had handled "hundreds if not thousands of traffic, misdemeanor, and felony cases," and that he had "tried numerous cases to jury verdicts," although he could not recall the exact number. Dennis's affidavit does not appear in the record.

Three years later, defense counsel were still not members of the CLTB. On June 23, 2006, the State filed a motion entitled "People's Motion to Determine Defense Attorneys' Qualifications to Represent Defendant in a Capital Case," in which it asked the court to "ensure Defendant's trial counsel possess the ability, knowledge, and experience to represent Defendant in this matter in a competent and professional manner." The State maintained that the amended rules did not apply, but requested another finding of record that counsel was competent to represent defendant:

"Since this case was filed by information and amended information before March 1, 2001, paragraphs (d) and (f)(I) [of Rule 416] do not apply to this case.

Nonetheless, the interests of fairness require that, in capital cases such as this case, the People and the Court have a duty to ensure that the proceedings are fair and that the Defendant is represented by trial counsel who possess the ability, knowledge and experience to represent Defendant in this matter in a competent manner."

The State acknowledged the previous discussions of counsel's qualifications, but it again requested that the court "put into the record both defense attorney's qualifications to represent a defendant in a capital case consistent with Supreme Court Rule 714," and "[v]erify with Defendant his desire to proceed to trial with counsel who are not members of the Capital Litigation Trial Bar as established pursuant to Supreme Court Rule 714."

Defense counsel responded to the State's motion, listing the prior proceedings and correspondences in which their qualifications had been examined. They argued that further proceedings on the issue were not necessary because there had been no new developments. They agreed with the State's assertion that the amended rules were "not applicable to the present case." In the attached memorandum, counsel concluded, "Rule 416 and the cited cases make it clear that the attorneys in the present case are not required to be certified as members of the Capital Litigation Trial Bar."

On August 18, 2006, Judge Stephen C. Mathers held a hearing on the State's motion. At that hearing, the State clarified its motion:

"I think it's possibly helpful to first in discussing this motion to first state what this motion is not. Number one it is not a motion to apply the capital litigation supreme court rules to this case. The People concede in their motion that those rules don't apply. ***

And defense counsel has filed its response and has delivered a memorandum with points and authorities establishing that. And in none of that do the People contest. They're absolutely right. They don't apply. And so we're not contending that.

The second thing to make clear is that the People are not seeking the removal of these defense counsel. We're not alleging that they are unqualified. In fact everything that the People know about their qualifications leads us to believe that they're fully qualified. The concern of the People in this matter is the constitutional guarantee of effective assistance of counsel and the need to protect the record in that regard."

The State also suggested that any potential problems could be solved by appointing a third attorney to represent defendant, if the

-47-

newly appointed attorney was a member of the CLTB.

Dennis pointed out to the court that this issue had been discussed several times previously, and he questioned what the State sought to achieve:

> "The State apparently concedes that Mr. Carter and I are qualified and competent and have been representing Mr. Ramsey in a qualified and competent manner. *** So it appears to me that even though they agree that the rules don't apply in this case and that Mr. Ramsey has been having competent counsel, they still want a little bit more. They have not specifically asked in their motion that someone from the capital litigation bar be assigned to this case but now they're apparently making that request.
>
> There are two other options that I see that would handle this question satisfactorily with the State. One is to take death off the table. And I've said that before and I'll say it again. That will resolve any questions that the State has with respect to a certified member of the capital litigation bar representing Mr. Ramsey. That's in their power. That's in their control. But they have not yet done that. So we're stuck with that situation with death still on the table.
>
> The other option would be for you to remove [defense counsel] from representation of Mr. Ramsey and appoint two new attorneys certified by the capital litigation bar. Although the State is not seeking that."

The court expressed its appreciation for the "overabundance of caution" that led the State to raise this issue again, although it worried that "an emphasis of form over substance and a continuous rehash of old business" was distracting the parties from "truly important matters." The court addressed defendant directly, and defendant declined to express any opinion to the court about his counsel. Ultimately, the court declined to order any change in defendant's representation. Neither counsel's qualifications nor the amended rules were discussed again.

Clearly, the plain language of Rule 701 does not require that this defendant's counsel be members of the CLTB. As explained above, the amended rule became effective March 1, 2001, and applies only to

cases filed on or after March 1, 2002. The amended indictment in this case was filed January 23, 1997. Defendant acknowledges that the rule does not apply, but he argues that the amendment nonetheless entitles him to a new sentencing hearing for three reasons. First, he argues that the exclusion of a case like this one, where a defendant was charged prior to the 2002 effective date but where substantial proceedings occurred after the effective date, was a mere oversight that produces an absurd or unjust result. Second, he argues that because he is the only defendant currently sentenced to death in Illinois who was not represented by a member of the CLTB, his equal protection and due process rights have been violated. Finally, he asks this court to find that the imposition of the death penalty under these circumstances would be "fundamentally unjust."

With respect to defendant's first argument, we note that Rule 701 requires attorneys to be members of the CLTB not only at the time of trial, but from the very beginning of their involvement in a case. The comments to amended Rule 701 (188 Ill. 2d R. 701, Committee Comments) state that any attorney who is not a member of the CLTB should decline any representation in a capital case, as well as in any first degree murder case that could become a capital case. The comments further suggest that it is incumbent on counsel to determine, before agreeing to representation, whether a case is likely to become a capital case. Moreover, the rule does not authorize a trial court to require that unwilling attorneys apply for CLTB membership. Thus, if counsel in a capital case refuses to become properly certified pursuant to Rule 701, the court must require that counsel step down or work only under the supervision of a CLTB-certified attorney. By requiring attorneys to be members of the CLTB from the very outset of a case, the rule avoids the disruption and delay that would be caused by allowing an attorney who is not a member of the CLTB to appear in the case, only to later require him or her to withdraw and be replaced by CLTB counsel unfamiliar with the case.

Defendant suggests that the retrial in his case distinguishes it from other ongoing capital cases, but that argument is not persuasive. This court's mandate granting defendant a new trial was filed on September 11, 2000, well before the effective date of the amendment to Rule 701. Discovery and other pretrial proceedings were long underway when the amendment took effect. Procedurally, defendant's case was

nearly indistinguishable at that point from a capital case filed in 2000. If the amendment to Rule 701 had been applied at its effective date to similarly situated capital cases, disruption, delay, and potential for prejudice could have ensued in *every* capital case pending at any stage throughout the state. This is precisely the result we sought to avoid in applying the new rules only to cases filed after the effective date, and defendant's case is a prime example. By the time the amendments took effect in 2002, defendant's trial attorneys had been working on his retrial for over 18 months; lead counsel had been representing defendant since his first trial in 1997. Counsel were familiar with the facts and witnesses, had filed over 15 motions, had engaged in substantial discovery, and had taken an interlocutory appeal on defendant's behalf. Although the trial court and the State suggested on at least three occasions that defense counsel should join the CLTB, both attorneys steadfastly declined. Requiring that both attorneys involved in his defense be replaced with CLTB members would have resulted in delay and disruption to a case that had already been unresolved for over six years. Rather than incur such delays in this and any other pending cases, we left ongoing cases outside the scope of the amendments to Rule 701. One inevitable effect of creating such a clear line for determining whether the amended rule applies is that some cases will fall short of that line. Defendant's is one such case, and we will not now rewrite the rule to include him. In this light, it is clear that applying the CLTB requirement prospectively only to cases filed after the effective date is not absurd, but is wholly consistent with the intent of the rule.

Defendant also argues that applying Rule 701 as written violates his equal protection and due process rights. According to defendant, every other capital defendant in Illinois whose case was filed before March 1, 2002, but who, like defendant, was sentenced after the amendment took effect was represented by a CLTB member. Thus, defendant claims he was "arbitrarily singled out." We disagree. It is axiomatic that the constitutional guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. *People v. Warren*, 173 Ill. 2d 348, 361 (1996). Here, the rule treated defendant in precisely the same manner as other defendants whose cases were filed prior to the rule's effective date; it did not apply to any of the cases. That the other attorneys to whom

defendant points chose to become CLTB members during the course of representation is of little relevance in this case. We have previously explained that, with respect to cases in which the amended rule does not apply, we will not presume an attorney rendered incompetent representation simply because he or she was not a member of the CLTB. *People v. Simpson*, 204 Ill. 2d 536, 570-72 (2001). In this case, defendant's attorneys were qualified and experienced capital litigators. Lead counsel had 23 years of criminal defense experience, with eight or more felony trials and two murder trials. Co-counsel had 15 years' experience in criminal defense, during which time he handled "hundreds if not thousands" of criminal cases, including more than five felony trials and one murder case. On this record, we are unwilling to conclude that counsel was not competent to represent defendant. Throughout the eight years that this retrial was pending, three different trial judges inquired into their qualifications and found them sufficient, and we agree. Defendant was not denied any equal protection or due process rights.

Finally, defendant asks us to find that the imposition of the death penalty in this case is "fundamentally unjust." Section 9–1(i) of the Criminal Code of 1961 states that this court "may overturn the death sentence *** if the court finds that the death sentence is fundamentally unjust as applied to the particular case." 720 ILCS 5/9–1(i) (West 2008). We find no basis for such a conclusion in this case. Although we emphasize the importance of ensuring that appointed counsel in capital cases have met every qualification we have set forth, in this case the amended requirements of Rule 701 did not apply. Contrary to defendant's claim of injustice, defendant received experienced, capable, and competent representation. That other ongoing cases proceeded differently than defendant's is no injustice when the same rules were applied to all of them. We therefore reject defendant's contention that he is entitled to a new sentencing hearing because his attorneys were not CLTB members.


II. Constitutionality of State's Seeking the Death Penalty

Following defendant's first conviction and direct appeal, this court reversed and remanded the cause to the trial court for a new trial.

Prior to trial, the State's Attorney notified defendant that she would again seek the death penalty. However, she did inform the court that if defendant agreed to plead guilty and accept a sentence of life without parole, she would not seek a death sentence. At the time the offer was made, defense counsel announced that "at this time I think we are going to trial."

Five years later, defendant pleaded guilty to several counts against him. By that time, the office of State's Attorney was occupied by a different individual. Both parties agree the guilty plea was in exchange for a dismissal of several other counts. However, defendant also claims that his guilty plea, in accordance with the former State's Attorney's initial plea offer, made him eligible for a sentence of natural life in prison but did not expose him to the possibility of a death sentence. The State did not agree and asked for a death penalty hearing. When defendant entered his guilty plea, he acknowledged that by pleading guilty he was "possibly subjecting himself to a sentence of death." The court specifically admonished defendant that the minimum sentence he could receive was a term of natural life in prison and that the maximum sentence was a death sentence.

The court accepted defendant's plea, a sentencing hearing was held, and defendant was again sentenced to death. Defendant now argues that the State's Attorney's decision to seek the death penalty was arbitrary and warrants his sentence being reduced to that of natural life in prison.

At the outset, we note that the State argues that defendant has forfeited this issue by failing to object in the trial court or to raise the issue in a posttrial motion. The State also argues that although defendant's claim could be reviewed for plain error, defendant has failed to argue plain error in his opening brief. Defendant acknowledges that this issue was not properly preserved, but disagrees with the State that he has also forfeited plain-error review.

In the absence of a plain-error argument by a defendant, we will generally honor the defendant's procedural default. *People v. Hillier*, 237 Ill. 2d 539, 549 (2010). However, although defendant did not argue plain error in his opening brief, he has argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error. *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000).

The first step in plain-error analysis is to determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant argues it was error for the trial court to allow the State to seek the death penalty, because a prior State's Attorney had already offered to waive the possibility of a death sentence if the defendant were to plead guilty. Defendant's claim is a due process challenge in that he argues the decision of the State's Attorney to seek a death sentence was impermissibly arbitrary.

Defendant cites *People v. Walker*, 84 Ill. 2d 512 (1981), and *People v. Brownell*, 96 Ill. 2d 167 (1983). In *Walker*, the defendant was charged with murder and entered into plea negotiations with the State. The parties agreed that the defendant would plead guilty to several other charges in return for the State's dropping a conspiracy charge and recommending a 60-year prison term for the murder. *Walker*, 84 Ill. 2d at 514. The court, in accepting the plea, incorrectly advised the defendant that the maximum penalty for the offense to which the defendant was pleading was 80 years. In fact, the indictment, as charged, justified a maximum penalty of death. The State failed to draw attention to the court's incorrect admonishments. *Walker*, 84 Ill. 2d at 515.

The defendant later moved to withdraw his guilty plea, alleging he did not fully understand the consequences of his plea and wanted to plead not guilty because of mental incompetence. Defendant was allowed to withdraw his plea. When defendant later sought to plead guilty again, the State sought the death penalty and the defendant was eventually sentenced to death. *Walker*, 84 Ill. 2d at 518.

The *Walker* court noted that "defendants who make knowing, voluntary, and intelligent choices to risk an increased sanction rather than plead guilty pursuant to a plea bargain will be held to that choice." *Walker*, 84 Ill. 2d at 522. However, this principle applies only when the defendant can, in fact, make a knowing, voluntary, and intelligent evaluation of the risks. *Walker*, 84 Ill. 2d at 522. In *Walker*, the court concluded that the State's failure to correct the trial court's admonishments meant that it adopted the court's position and "notified defendant that death was not a possible penalty for his crimes." *Walker*, 84 Ill. 2d at 523. When weighing the decision to withdraw his plea, defendant was under the mistaken impression that he was risking only an additional 20 years of imprisonment and not a

death sentence. Under these circumstances, when the State later sought the death penalty after the defendant's withdrawal of his guilty plea, the State sought to increase the severity of the sanction, without notice, after defendant's successful invocation of a right afforded by law. *Walker*, 84 Ill. 2d at 523-24. Thus, the defendant's sentence was reversed.

The procedural history in *Brownell* was slightly different. In that case, the defendant was convicted by the trial court and sentenced to death. This court vacated the sentence and remanded for resentencing. On remand, the defendant was again sentenced to death. On appeal, however, defendant raised a new issue. Defendant argued that prior to his first sentencing the prosecutor had promised not to seek the death penalty if the defendant would confess in writing.

This promise occurred at 10 p.m. The defendant, after consulting counsel, did not accept the offer. Later that night, the defendant spoke to a pair of police detectives. At 1 a.m., when the meeting ended, the defendant still declined to make any confession. An hour later, however, at 2 a.m., the defendant asked to talk to the police and confessed.

Based on these facts, and relying on *Walker*, this court vacated the defendant's sentence. We concluded that once the State's Attorney "made a conscious decision to agree not to seek the death penalty if the defendant would provide him with a confession," it was "incumbent on the State's Attorney to abide by the agreement absent a change in circumstances." *Brownell*, 96 Ill. 2d at 174-75. In the five hours between the State's Attorney's offer and defendant's written confession, nothing had changed, yet the State's Attorney had chosen to continue to seek the death penalty. This court concluded that this type of reversal "creates an appearance of a vindictive motive on the part of the prosecutor." *Brownell*, 96 Ill. 2d at 175.

The State, in turn, relies on *People v. Yates*, 98 Ill. 2d 502 (1983), and *People v. Davis*, 144 Ill. 2d 349 (1991). In *Yates*, defendant approached the prosecutor and asked if he would agree not to seek the death penalty in exchange for a guilty plea and recommended sentence of natural life imprisonment. The State agreed to make the offer, but the defendant turned it down and went to trial. Defendant was convicted and the State successfully sought the death penalty.

On appeal, this court concluded that the case was unlike *Walker*, in that the defendant was not misadvised of the maximum possible sentence he faced. *Brownell* was also distinguished because the State did not renege on its promise after getting what it bargained for.

In *Davis*, the defendant rejected a plea offer from the State. Nevertheless, the State filed a motion to waive its right to request a death penalty hearing. Before the court took any action on that motion, however, a new State's Attorney was sworn into office, withdrew the motion and proceeded to request a death penalty hearing. The defendant argued that *Walker* required the State to demonstrate some factual circumstance that changed between the filing of the motion and the successor State's Attorney's withdrawal of the motion. This court rejected that argument, concluding that no misrepresentations were made to the defendant about the seriousness of the punishment he could receive and the decision to seek the death penalty was based on the prosecutorial discretion of a new State's Attorney. Therefore, defendant had not suffered any deprivation of rights.

Here, defendant argues that the only distinction between *Walker* and *Brownell* and this case is that, in this case, the occupant of the State's Attorney's office changed between the time the State first offered a deal and the time the defendant ultimately entered a guilty plea. We disagree and conclude this case differs in other significant ways.

The first distinction is with *Walker*. Unlike *Walker*, defendant was, at all times, aware of the potential punishment he faced. The State sought a death sentence at his first trial. Later, in pleading guilty, defendant acknowledged that a death sentence was a possible result. This was true even though defendant knew that the State had made a previous offer to refrain from seeking a death sentence. As we stated in *Yates*, *Walker* is not implicated when the defendant does not labor under a misconception that death is not a possible sentence. *Yates*, 98 Ill. 2d at 534. Here, defendant was not misled by the court or the prosecutor and, therefore, cannot maintain a claim based on *Walker*.

A second distinction relates to *Brownell*, and specifically relates to the particular timing of the State's offer and defendant's eventual plea. In *Brownell*, a mere four hours passed between the State's initial offer not to seek a death sentence and the defendant's agreement to

write a confession. Even though defendant expressly rejected the deal at the time, it is evident he began rethinking that decision soon after, ultimately choosing to talk to police mere hours later.

In this case, defendant's decision to plead guilty came not four hours after the State's offer, but rather five *years* after the offer. Although the *Brownell* court concluded that there had not been any change in circumstances in those four hours, it is far more difficult to conclude that nothing changed over the five years in which the parties were preparing for a retrial.

Until April 2007, defendant continued to pursue a trial, risking the more serious penalty of death. This time line refutes any suggestion by defendant that the State's Attorney reneged on the bargain made by his predecessor. After five years of proceedings, there was no bargain between defendant and the State. Although we do not construe offers such as this in strict contractual terms (*Brownell*, 96 Ill. 2d at 176), the fact that defendant rejected the State's offer and prepared for trial for five years reflects the absence of any bargain. Unlike *Brownell*, defendant could not have reasonably believed that the earlier offer was still open, particularly when he acknowledged, in entering his guilty plea, that death was a possible sentence.

A contrary holding would allow the defendant to seek a plea offer from the State, reject it, and pursue a trial, forcing the State to spend the time and money to prosecute the case. Then, at the last possible moment, perhaps facing a conviction, the defendant could force the State to adhere to its side of the "bargain." Under this scenario, a prosecutor likely would be hesitant to risk making such a plea offer for fear of being bound indefinitely, even if the defendant initially rejected it.

In *Brownell*, this court concluded that the proper question is whether circumstances changed between the time the State's offer was made and the time that the defendant complied with the State's conditions. In this case, we answer that question in the affirmative and hold that the State's decision to again seek a death sentence did not violate defendant's right to due process.

### III. Excusing of Prospective Juror for Cause

During *voir dire*, prospective juror N.W. was questioned by the

trial court about his ability to vote for or against a death penalty verdict. He answered that he did not have strong feelings about the death penalty that would cause him to vote automatically for or against imposing a death penalty. Instead, if the evidence showed that death was an appropriate sentence, N.W. indicated he could sign the verdict. Likewise, if the evidence did not demonstrate that death is the appropriate sentence, he would not sign the death penalty verdict form.

However, upon further questioning by the State, the following exchange occurred:

> "MR. ELWARD [prosecutor]: *** If at the end of this case, Jim, Mike and I prove to you by the evidence in this case beyond a reasonable doubt that the Defendant is guilty, he is eligible for the death penalty, and at the sentencing hearing, in your opinion, the only appropriate sentence is the death penalty, can you sign that verdict?
>
> [Prospective Juror N.W.]: No, I don't think that I could.
>
> MR. ELWARD: And I appreciate your honesty. Can you tell me why not?
>
> [Prospective Juror N.W.]: I am not for sure why not. I don't want to take responsibility for that.
>
> MR. ELWARD: You don't want to take responsibility for that.
>
> [Prospective Juror N.W.]: Yeah.
>
> MR. ELWARD: Judge, I don't have any more questions."

Later, N.W. was questioned by defense counsel. During this questioning, the following exchange occurred:

> "MR. CARTER: Concerning the issue of the death penalty that you may have to determine, if you are selected as a juror in this case, would you listen to the opinions of the other jurors concerning that process?
>
> [Prospective Juror N.W.]: Yeah.
>
> MR. CARTER: And would you consider their opinion in making your decision?
>
> [Prospective Juror N.W.]: No.
>
> MR. CARTER: You would not.

[Prospective Juror N.W.]: It depends–I don't know.

MR. CARTER: Well, I am asking you if you would consider having an open mind to the possibility of voting for the death penalty, if you are asked to serve and follow the law in the case. And I am asking you, can you do that?

[Prospective Juror N.W.]: Yeah."

The State challenged N.W. for cause on the ground, among others, that he stated he could not sign a verdict of death. Defense counsel objected, arguing that N.W. indicated he had no feelings one way or the other on the death penalty and that he indicated he would be fair and impartial.

The trial court allowed the State's challenge for cause, stating,

"The prospective juror indicated that he could not sign a verdict form imposing the death penalty, and just as he understood the other questions, this was not a failure to communicate, in the court's opinion. He understood the question, and he answered it indicating that he could not do that. This is the first juror who has indicated when a clear and succinct question has been put to them as to whether they could or could not sign that form, indicated that he could not, and that's troublesome to the Court, and in the exercise of my discretion I am going to excuse the juror on that basis and on that basis alone."

Defendant now contends that the trial court erred in allowing the State's challenge, resulting in a violation of his sixth and fourteenth amendment rights.

A trial court may remove a prospective juror for cause because of the person's views toward the death penalty when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980); *People v. Banks*, 237 Ill. 2d 154, 189-90 (2010). It is not enough, to dismiss a juror for cause, that the juror "voices only general objections to the death penalty." *Banks*, 237 Ill. 2d at 189. The trial judge is in a superior position to gauge the meaning of the prospective juror's

responses to the examination. *People v. Tenner*, 157 Ill. 2d 341, 363 (1993). Therefore, a decision of the trial court to excuse a prospective juror for cause is reviewed for abuse of discretion. *People v. Taylor*, 166 Ill. 2d 414, 421-22 (1995).

Defendant argues that, in this case, it cannot be concluded that N.W.'s views are opposed to the death penalty. Defendant supports this claim by arguing N.W. informed the court that he had no difficulty with Illinois law providing for a death penalty and that his beliefs would not prevent him from being fair and impartial to both sides. Defendant argues that N.W., at no time, expressed any feelings against the death penalty. We disagree.

It is necessary to consider the prospective juror's statements as a whole and not in isolation. *Taylor*, 166 Ill. 2d at 421. Although N.W. informed the court that he did not have strong feelings either for or against the death penalty, in response to a direct question as to whether he could sign a verdict imposing a death sentence, he replied, "No, I don't think I could." He explained that he did not "want to take responsibility for that." Although N.W. went on to agree that he could have an "open mind to the possibility of voting for the death penalty," N.W.'s statements, taken as a whole, demonstrate at least some doubt as to whether he would be able to sign a death verdict.

Defendant argues that N.W.'s views on the death penalty are not even known. However, we can infer that whatever his views of the death penalty in ideological or moral terms, he admitted he did not think he could sign a death verdict. Thus, whatever his views may be, his answer demonstrated they could have foreclosed or substantially impaired the performance of his duties, thereby undermining the fairness of defendant's trial. Precise knowledge of the prospective juror's views, or the reasons behind them, are not always necessary to determine whether such views will interfere with the juror's ability to perform his duties. It might be helpful to question a prospective juror as to such matters if the court thinks he is seeking merely to avoid jury duty. However, where the court determines the prospective juror to be sincere in his belief he cannot sign a particular verdict, and where his answers suggest an inability to carry out his duties, the court need not examine in detail the prospective juror's moral and political leanings. Here, the record reflects statements by N.W. that suggest he would not have been able to carry out his duties. The trial court was

in the best position to determine whether N.W. was credible as to those statements. Therefore, we hold that the trial court did not abuse its discretion in excluding prospective juror N.W. for cause.

IV. Exclusion of Portion of Testimony by Defense Expert Witness

At his first trial, defendant raised an insanity defense. Dr. Conroe testified as a defense expert that defendant met the second prong of the insanity statute in that he was unable "to conform his conduct to the requirements of the law" at the time of the offense. The trial court applied an amended version of the statute that was in effect at the time the crimes were committed. The statute, as amended, narrowed the definition of insanity to eliminate the "inability to conform" prong and increased a defendant's burden of proof for an insanity defense to one of clear and convincing evidence. *Ramsey*, 192 Ill. 2d 154; 720 ILCS 5/6–2 (West 1996). This court subsequently found that the act amending the statute in this manner violated the single subject rule of the state constitution. *People v. Reedy*, 186 Ill. 2d 1 (1999). Thus, defendant was entitled to a new trial at which he would be "allowed to present an insanity defense based on his inability to conform his conduct to the law" and "required to prove his insanity at the time of the offense by a preponderance of the evidence." *Ramsey*, 192 Ill. 2d at 159. Instead, defendant elected to enter a plea of guilty in return for dismissal of certain charges.

Defendant notes in his brief that "[o]ne of the central themes of mitigation presented by the defense was that death was not an appropriate penalty" because at the time of the crimes, defendant suffered from several mental disorders. This "theme" was intended to provide support for the jury's consideration of one of the seven mitigating factors enumerated in the statute: "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." 720 ILCS 5/9–1(c)(2) (West 1996).

At the sentencing hearing, Dr. Conroe again testified as an expert witness for the defense. He testified that defendant had a long history of several chronic mental disorders, including Asperger's Disorder, Borderline Personality Disorder, and ADHD, and that he had a history of Conduct Disorder as a youth. In combination, these disorders

affected his ability to make judgments and to manage his feelings. Conroe opined that as a result of these disorders, defendant was "under extreme duress" at the time he committed the crimes.

In an effort to clearly bring Conroe's opinion within the scope of the statutory mitigating factor, defense counsel asked the witness whether the diagnosed "disorders" could be characterized as "mental disturbances." Conroe replied "yes." The State objected and, following a sidebar discussion, the trial court sustained the objection and informed the jury to disregard the question and the answer.

At a hearing the following day, the parties made a record of the basis for the objection and the court's ruling. The State objected to the witness's opinion on the basis that it had not been disclosed previously, either in his written report or his discovery deposition. Defense counsel argued that there had been no discovery violation, because it was implicit in Conroe's opinion and earlier testimony that defendant suffered from an extreme mental disturbance. That is, because Conroe opined that defendant's mental state prevented him from conforming his conduct to the law, he necessarily opined that defendant's condition met the "lesser standard" of extreme mental disturbance. The trial court rejected this argument, finding that because Conroe had "opined on other matters," including "whether defendant was insane at the time of the offenses," his disclosure of this opinion at trial was a discovery violation and would not be allowed.

In closing argument, defense counsel spoke at length about defendant's history of mental illness and suggested that the evidence showed that when he committed these crimes, defendant "wasn't completely in his right mind." He reviewed the diagnoses reached by Drs. Conroe and Killian, including ADHD, and discussed the bases for these diagnoses. Counsel emphasized the effect of ADHD on defendant's "problem solving, coping, and thinking through decisions." He discussed defendant's "frantic efforts to avoid real or imagined abandonment" and impulsivity, both related to Borderline Personality Disorder, an "identity disturbance." Counsel noted that Conroe "characterized the mental illnesses as extreme" at the time of the crimes. He argued that the defense witnesses on the mental health issues were more credible, based on their professional credentials and the depth of their evaluations, than the State's witnesses. The remainder of closing argument recounted the details of defendant's

birth and childhood, including the traumatic discovery of his adoption and the repeated recommendations that he receive various forms of therapy that were rejected by his adoptive parents.

The jury was instructed to consider mitigating factors "if supported by the evidence," including whether "the murders were committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution." In addition, the jury was instructed that "[w]here there is evidence of a mitigating factor, that fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence."

Defendant asserts that excluding Conroe's answer to this question is error entitling him to a new sentencing hearing. He argues that: (1) there was no discovery violation because the answer to the question was not a matter of Conroe's opinion, (2) there was no discovery violation because Conroe's opinion regarding defendant's mental disturbance was adequately disclosed, (3) if there was a discovery violation, the exclusion of Conroe's answer was an abuse of discretion, and (4) if the sanction imposed for the discovery violation was within the trial court's discretion, defense counsel was ineffective for failing to obtain Conroe's opinion on this question prior to trial and to make a timely disclosure of this opinion to the State.


*Discovery Violation*

Before considering the appropriateness of the sanction imposed by the trial court, a threshold question must be answered–whether there was a discovery violation by the defense. *People v. Hood*, 213 Ill. 2d 244, 256 (2004). Where, as here, the facts giving rise to the alleged discovery violation are not in dispute, the question is one of law that we review *de novo*. *Hood*, 213 Ill. 2d at 256.

Defendant asserts that the question asked of Conroe did not seek to elicit the witness's opinion. For this assertion, defendant relies on the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), a publication of the American Psychiatric Association, which sets out the diagnostic criteria for recognized psychiatric disorders. The text of the DSM-IV-TR uses the word "disturbance" to describe each of the conditions diagnosed by Conroe. Thus, defendant argues, in

describing these disorders as disturbances, Conroe was not expressing an expert opinion, but was merely using the "accepted terminology of the psychiatric community." Thus, the question posed to Conroe sought "clarification of the scientific fact that mental 'disorders' can also be characterized as 'disturbances.' " Therefore, according to defendant, the lack of an express statement to that effect in either Conroe's written report or his deposition testimony cannot constitute a discovery violation.

The State argues that defendant has forfeited this argument by not raising it at trial, citing *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984). In that case, the State's brief to this court challenged the jury instruction on self-defense that was given at trial, basing its objection "on an entirely different theory" from the one raised in the trial court. Because the ground on which the instruction was being challenged had not been brought to the attention of the trial court, this court concluded that the State forfeited any right to have this court consider the question on review. *O'Neal*, 104 Ill. 2d at 407.

In the present case, we need not determine whether defendant has forfeited this issue or is merely citing new authority in support of a properly preserved issue because this argument clearly lacks merit. The State did not object to Conroe's mere use of the word "disturbance" in a manner that members of his profession typically use the word. Rather, the State objected when defense counsel asked Conroe whether the diagnoses he had made "could" be characterized as "mental disturbances." This question clearly called for the witness to express his expert opinion on the question. If the question and answer had been allowed, the next question would likely have been whether, in the doctor's expert opinion, the effect of these disturbances upon the defendant was "extreme" at the time he committed the murders, thus obtaining an expert opinion regarding the existence of a statutory mitigating factor. If Conroe's opinion on this matter was not previously disclosed to the State, the objection was properly sustained because he was being asked for his opinion.

Defendant also argues that Conroe's written report and deposition adequately disclosed his expert opinion regarding the existence of an extreme mental disturbance at the time defendant committed the murders. His written report stated that the "intense feelings of abandonment following the break-up of the relationship with Ms.

Sloop precipitated significant depression with serious suicidal ideation." In addition, Conroe opined that defendant's various mental illnesses "all affected his ability to control his anger and despair, to maintain rational thinking and to come up with a number of options that would prevent him from harming himself or others." "He could not control the intense feelings that overwhelmed him." In his discovery deposition, Conroe testified that he had no opinion about defendant's mental condition at the time of the crimes that was not contained in his written report, but reiterated that "there was a confluence of events that led to his feelings overwhelming him."

The trial court rejected this argument, stating that "it would be impossible to sort out those [opinions] which may have been a subset of a previously-disclosed opinion or not." Similarly, the court observed that "it would be difficult if not impossible to try to interpret such nondisclosed opinions because the Court would then be in the process of interpreting the disclosures which had been made."

We note that although the existence or nonexistence of this mitigating factor may be supported by expert opinion, a jury may find, based on the facts before it, that a defendant was acting under an extreme mental or emotional disturbance, even in the absence of an expert opinion to that effect or in the presence of a contrary expert opinion. See, *e.g.*, *People v. Ramirez*, 98 Ill. 2d 439, 467-68 (1983) (finding it proper for State's expert witness to give opinion as to whether defendant was acting under the influence of an extreme mental or emotional disturbance at the time of the murder, but noting that the jury was free to reject that opinion based on the facts before it). We also note that a diagnosis of some form of mental illness does not necessarily establish the mitigating circumstance of extreme mental or emotional disturbance at the time the defendant committed the murders. See *People v. Crews*, 122 Ill. 2d 266, 283 (1988).

With this in mind, we agree with the trial court. Conroe's report and deposition testimony contained some statements that might have been consistent with an opinion that defendant was extremely disturbed, mentally or emotionally, at the time of the murders. However, Conroe made no express statement to this effect in either his written report or his deposition testimony. The trial court properly declined to parse the earlier disclosures to see if they might support such an unexpressed opinion.

In sum, we conclude that the trial court properly ruled that the defense failed to disclose the expert's opinion on this matter and turn to the question of the proper sanction for the discovery violation.

*Sanction*

When this court has had occasion to consider allegations of discovery violations in capital cases, it has most often been in the context of a defendant's claim that the State's violation of the discovery rules entitles him to a new trial. See, *e.g.*, *People v. Lovejoy*, 235 Ill. 2d 97 (2009); *People v. Sutherland*, 223 Ill. 2d 187 (2006). We have not had occasion to consider whether a sanction imposed on a capital defendant for a discovery violation is excessive. Thus, the authorities cited by defendant are from our appellate court in noncapital cases.

Defendant cites *People v. Hawkins*, 235 Ill. App. 3d 39, 43 (1992), for the proposition that the purpose of sanctions for discovery violations is to compel the party's compliance with discovery, not to punish him. Further, discovery sanctions should be "fashioned to meet the circumstances of the particular case with the ultimate objective of compelling compliance, not punishing a party for the oversight or the errors of his attorney." *People v. Damico*, 309 Ill. App. 3d 203, 212 (1999). Defendant further asserts that the sanction of excluding defense evidence in criminal cases should be applied only in extreme situations, citing *People v. Houser*, 305 Ill. App. 3d 384, 390 (1999) (trial court abused its discretion by barring necessity defense where defendant timely disclosed intent to raise related defense of compulsion), and *People v. Foster*, 145 Ill. App. 3d 477, 481 (1986) (exclusion of defense witness as discovery sanction was abuse of discretion where failure to disclose was inadvertent and State had ample opportunity to interview the witness before trial). Finally, defendant argues that if a less drastic sanction is available to redress a discovery violation by the defense, it is an abuse of discretion for the court to impose "the ultimate sanction of exclusion of evidence," citing *People v. Brooks*, 277 Ill. App. 3d 392, 398 (1996) (exclusion of defense witness as discovery sanction was abuse of discretion where sanction deprived defendant of his ability to present a defense), and *People v. Jackson*, 48 Ill. App. 3d 769, 771-72 (1977) (exclusion of defendant's eyewitnesses, who were fellow inmates in correctional

facility, was abuse of discretion where State was presumed to know identity and location of witnesses within its control). Defendant acknowledges that he has the burden of demonstrating prejudice as a result of the imposition of an improper sanction. *Foster*, 145 Ill. App. 3d at 481. In general, we agree with these propositions, noting, however, that sanctions imposed in the cited cases were more severe than the mere exclusion of a testifying witness's answer to a single question.

On the merits, defendant argues that the opinion testimony need not have been excluded because the State could have impeached Dr. Conroe on cross-examination for his failure to testify during his deposition that mental disorders may be characterized as "disturbances." In the alternative, the trial court could have called a recess, during which the prosecutor could have questioned the witness regarding this newly disclosed opinion. He also argues that the State could not have been surprised that he was relying on Conroe's testimony to support his assertion of extreme mental or emotional disturbance as a mitigating factor. He accuses the State of making an objection that was "nothing more than a disingenuous 'gotcha' based on Conroe's failure to explicitly equate disorders with disturbances at his deposition" and insists that the trial court did not consider alternative sanctions, but "mechanically ruled" that the question and answer would be excluded.

The State responds that the sanction was appropriate. The witness testified at length regarding the various diagnoses he made and how, in his opinion, these conditions affected defendant's emotions and judgment at the time of his crimes. Defendant was not prevented from relying on the mitigating factor of extreme mental or emotional disturbance and could have argued to the jury that Conroe's testimony supported a finding that this factor existed. In addition, the jury was instructed to consider this specific mitigating factor. In the alternative, the State argues that even if the trial court abused its discretion by not ordering a less severe sanction, the error was harmless.

The imposition of sanctions for discovery violations is governed by Rule 415(g)(i):

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued

-66-

pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." 134 Ill. 2d R. 415(g)(i).

A trial court's decision as to the appropriate sanction for a discovery violation is subject to review for abuse of discretion. *Hood*, 213 Ill. 2d at 256. An abuse of discretion exists only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

Defendant acknowledges that, in general, sanctions imposed for discovery violations are reviewed under the abuse of discretion standard, but argues that this standard is too deferential to the trial court where evidence has been excluded for a discovery violation. He cites *People v. Scott*, 339 Ill. App. 3d 565, 573 (2003), for the proposition that the sanction of exclusion should be "closely scrutinized on appeal."

In *Scott*, defense counsel filed a supplemental answer to discovery on the day of trial, in which she named an investigator for the public defender's office as a potential witness. Counsel had informed the prosecutor of her intention to call this witness two days earlier and had informed the prosecutor's co-counsel the previous week. *Scott*, 339 Ill. App. 3d at 567. The investigator, if allowed to testify, would have stated that a key prosecution witness had recanted his previous statement that he had seen the defendant hand the murder weapon to the individual who then shot the murder victim. *Scott*, 339 Ill. App. 3d at 570. The trial court excluded the investigator's testimony as a sanction for the discovery violation. *Scott*, 339 Ill. App. 3d at 571.

The appellate court noted the abuse of discretion standard, but observed that "few rights are more fundamental than an accused's sixth amendment right to present witnesses in his own defense." *Scott*, 339 Ill. App. 3d at 572, citing *Taylor v. Illinois*, 484 U.S. 400, 408, 98 L. Ed. 2d 798, 810, 108 S. Ct. 646, 652 (1988). The court stated that exclusion of testimony or evidence is "disfavored" because it does not contribute to the truth-seeking goal of the trial and, thus, is appropriate only in "the most extreme situations." *Scott*, 339 Ill. App. 3d at 572-73. After considering several factors that a trial court

"should consider in determining whether the exclusion of a witness is an appropriate discovery sanction," including "the effectiveness of a less severe sanction, the materiality of the witness's proposed testimony to the outcome of the case, the prejudice to the other party caused by the testimony, and evidence of bad faith in the violation of the discovery rules" (*Scott*, 339 Ill. App. 3d at 573), the court found exclusion of the witness to be an abuse of discretion and granted the defendant a new trial (*Scott*, 339 Ill. App. 3d at 579).

The present case is readily distinguishable from *Scott*. First, the trial court in the present case did not exclude the witness's testimony altogether, but only one question and his answer to that question. Second, the excluded witness in *Scott* would have testified that the State's eyewitness had earlier recanted his account of the shooting while, in the present case, the witness merely would have expressed an opinion on a matter that the jury was capable of determining based on the substance of his earlier testimony and other evidence. Finally, the State would have been severely prejudiced by the admission of the previously undisclosed opinion in the present case, because it was not prepared to rebut the opinion with testimony of its own expert witnesses. Mere cross-examination of the witness about the fact that he had not disclosed the opinion in his written report or during his deposition would hardly have been effective, since the witness could have explained that he had not been asked previously for his opinion on this matter. Effective impeachment would have required the State to be able to present its own witness to rebut Conroe's opinion. The trial court was not required to interrupt the sentencing hearing to allow the State to obtain such a witness.

Rule 415 clearly contemplates that evidence may be excluded as a sanction for a discovery violation. After consideration of the factors enumerated by the *Scott* court, we conclude that exclusion of the defense counsel's question and Conroe's answer was not an abuse of the court's discretion, especially considering the court's knowledge that the expert's testimony contained information from which defense counsel could argue and the jury could find the existence of the mitigating factor.

Defendant argues, however, that he was prejudiced by the sanction of exclusion because the trial court instructed the jury to disregard the question and answer, and the jury members "undoubtedly concluded

from the court's admonition that disorders *** could *not* be considered 'disturbances.' " (Emphasis in original.) He asserts that it is "possible, if not likely, that one or more jurors concluded that Conroe's testimony regarding defendant's various mental illnesses was irrelevant to this statutory mitigating factor" and that the "trial judge essentially told the jurors that *disorders* cannot be considered *disturbances*." (Emphasis in original.)

The jury heard testimony from 51 witnesses during 11 days of hearings over a 15-day period. Dr. Conroe's testimony took almost an entire day. We find it highly speculative that the jury would attach such significance to the admonition to disregard one question and one answer during his testimony. Further, even if one or more of the jurors might have drawn this conclusion, it cannot provide a basis for a finding that the trial court abused its discretion at the time it made the ruling. At that time, the trial court was aware that Conroe had testified to facts and opinions that could support an argument that defendant was extremely disturbed at the time he committed the murders and that defense counsel would have the opportunity, in closing argument, to "connect the dots" between the substance of Conroe's testimony and the statutory mitigating factor.

We, therefore, conclude that the discovery sanction imposed by the trial court was not an abuse of discretion.

*Ineffective Assistance of Counsel*

Defendant argues in the alternative that if there was a discovery violation and if Conroe's opinion was properly excluded as a sanction for that violation, he is entitled to a new sentencing hearing because defense counsel was ineffective. Specifically, he argues that counsel's failure to ensure that Conroe "used the term 'disturbance' in his report or at his deposition" was objectively unreasonable and that counsel's failure was the direct cause of the trial court's decision to exclude the proffered testimony.

Claims of ineffective assistance of counsel are evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984), which requires the defendant to demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness and

(2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Davis*, 205 Ill. 2d 349, 364 (2002). We assess counsel's performance using an objective standard of competence under prevailing professional norms. To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable. *People v. Richardson*, 189 Ill. 2d 401, 413 (2000).

In support of his argument that counsel's performance was deficient, defendant relies on this court's decision in *Ramirez*, which held that an expert is not precluded from testifying that a defendant was under the influence of an extreme mental or emotional disturbance at the time of the crime. This court rejected the defendant's argument that the expert's opinion was inadmissible because it embraced an ultimate issue of fact that was for the jury alone to decide. *Ramirez*, 98 Ill. 2d at 467.

Subsequent cases, according to defendant, support his assertion that effective defense counsel seek to elicit expert testimony in conformity with the precise language of the statutory mitigating factor. He cites as examples *People v. Urdiales*, 225 Ill. 2d 354, 402 (2007) (clinical psychologist testified that defendant acted while "under the influence of an extreme mental or emotional disturbance but not such to constitute a defense to the prosecution"), *People v. McNeal*, 194 Ill. 2d 135, 145 (2000) (noting that licensed clinical psychologist testified that "defendant was under the influence of an extreme mental or emotional disturbance at the time of the present offenses"), *People v. Smith*, 176 Ill. 2d 217, 255 (1997) (licensed clinical social worker testified that defendant was suffering "an extreme mental and emotional disturbance, possibly a 'transient psychotic episode,' at the time he murdered" the victim), *People v. Garcia*, 165 Ill. 2d 409, 443 (1995) (Freeman, J., concurring in part and dissenting in part, joined by McMorrow, J.) (forensic psychiatrist testified that while defendant was not legally insane at the time of the murder, she "suffered from a very serious mental disorder and was under the influence of an extreme mental or emotional disturbance at

the time of the crime"), and *People v. Seuffer*, 144 Ill. 2d 482, 498 (1991) (two expert witnesses for the defense stated that, "in their opinions, the defendant was acting under the influence of an extreme mental or emotional disturbance at the time of his offenses").

We note that Seuffer's death sentence was vacated by this court on the basis of the improper exclusion of a prospective juror. *Seuffer*, 144 Ill. 2d at 524. In each of the other cited cases, however, the defendant's conviction and death sentence were affirmed or, in the case of McNeal, his postconviction petition denied, despite the specificity of the expert testimony.

Thus, these cases offer no authority in support of defendant's argument that counsel's performance fell below an objective standard of reasonableness. Defendant has cited no case in which this court has said that defense counsel should or must elicit expert testimony in conformity with the precise language of the statutory mitigating factor.

The State does not respond to defendant's argument regarding counsel's performance.

While we acknowledge that it is reasonable for defense counsel to present expert testimony that uses the language of the statute to specifically addresses the mitigating factor of a defendant's extreme mental or emotional disturbance at the time he committed murder, such evidence is not a prerequisite to the jury's consideration of the factor.

The term "disturbance" is not defined in the statute and, thus, is to be given its plain and ordinary meaning, both by the court and as it is used in jury instructions. *People v. Cardamone*, 232 Ill. 2d 504, 513 (2009) (because the applicable statute did not provide definitions for "emotional distress" or "mental anguish," this court assumed that the legislature intended for the terms to have their plain and ordinary meanings). Further, the statutory phrase "extreme mental or emotional disturbance" is neither a standard psychiatric diagnosis nor a legal term of art.

A disturbance is "an interruption of a state of peace or quiet : an agitating or agitation esp. of the mind or feelings." Webster's Third New International Dictionary 661 (1993). This term is used in everyday speech to describe a difficult neighbor, a hostile coworker,

a bitter ex-spouse, or any number of individuals that one might encounter. Thus, a jury could, based on its consideration of both lay and expert witness testimony, conclude that a defendant was in an extreme emotional state brought on by anger, jealousy, fear, grief, or other intense feeling, at the time he committed murder. Such an emotional state could exist with or without the presence of mental illness.

Therefore, while expert testimony connecting a defendant's history of mental illness to his mental state at the time he killed might be helpful to the defendant who claims mitigation on this basis, it is not an absolute requirement. For example, in *People v. Gacy*, 103 Ill. 2d 1, 95 (1984), the defendant argued that trial counsel was ineffective for failing to present evidence at the sentencing stage on the statutory mitigating factor of extreme mental or emotional disturbance. Although counsel presented expert testimony at the guilt stage, he chose not to recall any of the expert witnesses at the sentencing stage. Instead, he used their previous testimony, which had been readmitted by stipulation, to argue to the jury that this mitigating factor was present. This court concluded that it was not unreasonable for counsel to choose this approach, perhaps to avoid antagonizing the jurors by presenting testimony that might appear redundant. *Gacy*, 103 Ill. 2d at 95-96.

In the present case, counsel's failure to obtain and present a specific expert opinion on the statutory mitigating factor was likely inadvertent, rather than a matter of trial tactics or strategy. However, he did present ample evidence, including the remainder of Conroe's testimony, that provided a basis for him to argue in closing and for the jury to find that the mitigating factor existed. Therefore, despite this misstep, we cannot say that counsel's performance fell below an objective standard of reasonableness.

Because we conclude that defendant has not met the first prong of the *Strickland* test, we need not consider the second prong.

V. Prosecutor's Reference to Other Crime
Committed by Defendant

During the State's case in aggravation, the prosecutor presented

evidence that defendant and an accomplice committed a burglary in 1993. Amy Briggs identified defendant as one of the two persons she discovered stealing a VCR when she returned to her boyfriend's house to retrieve an item she had forgotten. She also testified that it was possible her boyfriend, the victim, owned a gun. Defense counsel objected to this line of questioning regarding the gun and the objection was sustained. The court also instructed the jury that it was to disregard the question and any answer that may have followed it. The court added, "You should not consider it in any way."

Later, Tom Crew, a police witness for the State, testified that defendant's accomplice in that burglary blamed the burglary on defendant because the crime was defendant's idea. Crew added that according to the accomplice, "one of the main focuses was to obtain a weapon or a firearm of some kind." Defense counsel did not object to this testimony.

Lastly, the prosecutor questioned defendant's juvenile court officer and made a final reference to the gun by asking the following:

> "Prosecutor: The defendant committed the burglary with a man by the name of Dustin Wade?
>
> Wood: Okay.
>
> Prosecutor: Wade told police the defendant wanted to get a gun to shoot a police officer.
>
> Defense Counsel: Objection. Leading.
>
> COURT: Sustained.
>
> * * *
>
> Prosecutor: The defendant was caught in someone's home, right? He was caught in someone's home, right?
>
> Wood: I remember Dustin Wade. I remember there being a burglary, but I do not remember the circumstances.
>
> Prosecutor: And the defendant was trying to steal a gun, right?
>
> Defense Counsel: Objection. Leading.
>
> COURT: Sustained."

Defendant argues that these three references to the burglary victim's gun unfairly prejudiced defendant by suggesting that defendant was a violent person. He argues that the remark that

suggested defendant wanted to shoot a police officer was particularly inflammatory and denied defendant a fair trial. We disagree.

We first note that the State does not specifically argue that the prosecutor's questions at sentencing were proper. Rather, it assumes *arguendo* that the references to defendant's purported motive for the burglary were improper. We also make this assumption, which favors defendant, and conclude that even if the prosecutor's questions were improper, they did not deny defendant a fair trial.

Every defendant has the right to a trial free of improper prejudicial comments or arguments by the prosecutor. *People v. Simms*, 192 Ill. 348, 396 (2000). This right is of constitutional magnitude. Therefore, we review *de novo* the question of whether a prosecutor's statements denied the defendant a fair trial. *People v. Burns*, 209 Ill. 2d 551, 560 (2004). Although a defendant is entitled to a trial free of improper comments, not every improper question or comment requires reversal. Instead, " 'the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice.' " *People v. Childress*, 158 Ill. 2d 275, 298 (1994), quoting *People v. Baptist*, 76 Ill. 2d 19, 30 (1979).

In this case, most of the State's allegedly improper questions were met with immediate objections from defense counsel. During the State's questioning of the burglary victim's girlfriend, defense counsel objected to the question whether the victim owned a gun. The objection was immediately sustained and the trial court went so far as to offer a verbal instruction that the jury was not to consider the question or answer in any way. Later, during the State's questioning of defendant's juvenile court officer, defense counsel again objected to both references to a gun. Both objections again were immediately sustained.

The only mention of a gun that went uncured by the trial court was made during the State's questioning of police officer Tom Crew, who indicated that part of the motivation for the burglary was to obtain a gun. This, too, however, weighs against defendant, as the failure to object denied the court the opportunity to cure the error. Counsel cannot gain the advantage of obtaining a reversal through his own failure to act. *People v. Carlson*, 79 Ill. 2d 564, 577 (1980).

Even had counsel objected to Crew's statement, we conclude that

defense counsel's objections, and the trial court's response to those objections, adequately cured any prejudice to defendant. Any prejudice to defendant was minor, when the references are viewed in the context of the sentencing hearing as a whole. These references to stealing a gun, including the question that went unchallenged by defense counsel, constituted a small part of the State's case in aggravation. During the sentencing phase, the State focused primarily on the circumstances of the crime itself. Specifically, the State focused on the number of victims and the cold and calculated manner in which defendant committed the crime. It emphasized the deceit defendant used to get the adults out of the Sloop house. The State also focused on refuting the mitigating factors defendant presented. After the objections on the issue were sustained, the State did not mention in argument that the defendant wanted to steal a gun. Overall, the evidence and circumstances of the crime and the arguments based on this evidence overshadowed the isolated references to defendant's desire to steal a gun. As a result, we cannot say that such references were so prejudicial that they could not be cured by a sustained objection and instructions from the court. Therefore, we hold that defendant was not denied a fair trial on the basis of the State's improper questions.

## VI. Prosecutor's Remarks in Closing Argument
### Regarding Mitigation Evidence

During the sentencing phase of defendant's trial, defendant sought to demonstrate that he would "positively adapt to the structured environment of incarceration" and would not be a threat to others. Defendant relied primarily on the testimony of psychologist Mark Cunningham. Dr. Cunningham concluded, after reviewing defendant's records and interviewing several corrections officers, that "there is a very low likelihood that Dan Ramsey would commit an act of serious violence or seriously injure someone while confined for life."

In closing, the State responded to defendant's mitigation argument with the following:

> "But the instructions say that you must also consider the evidence in mitigation, and we ask that you do that, that you do your duty and consider the evidence in mitigation. And I

want to talk to you about the evidence that you've heard in mitigation in this case. What evidence has the defendant presented? Well, you heard from Dr. Cunningham. Recall that Dr. Cunningham testified that in his opinion, the defendant would not likely commit any acts of violence in prison. And I ask you: Is that relevant to doing justice in this case? How is that relevant to what the appropriate sentence of the defendant should be or to his actions in this case or to any issue that you have to decide in this case? And isn't that the purpose of prison, to prevent violence. Anyway, we know that the defendant is not the type of out-of-control, impulse-driven killer who is likely to act out in those types of settings. No, he's cold, calculating, cold-blooded, manipulative, kills to meet his needs. We suggest that Dr. Cunningham's evidence is not entitled to much weight here."

The prosecutor also suggested that the testimony of defendant's jail guard and community service supervisor were also "not entitled to much weight here." Defendant argues that these comments were misstatements of the law and prevented jurors from considering Dr. Cunningham's testimony as evidence in mitigation.

Defendant acknowledges that he failed to preserve this issue for review, as he did not object to the prosecutor's argument at trial. However, defendant asks this court to review the issue for plain error. A reviewing court may consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. In this case, defendant argues a clear and obvious error occurred and both that the evidence was closely balanced and that the error was of such magnitude as to deny defendant a fair sentencing hearing.

Our first step is to assess whether a clear or obvious error occurred. When determining the propriety of a prosecutor's closing argument, a reviewing court must evaluate the comments in the context in which they were made. *People v. Burgess*, 176 Ill. 2d 289, 319 (1997). Defendant's argument focuses on the prosecutor's

comments as a misstatement of the law. Defendant contends that because a defendant's ability to adjust to life in prison is widely accepted evidence in mitigation, the State improperly suggested that this evidence was not relevant and should not be considered.

It is well settled that an attorney may not misstate the law in closing argument. *People v. Woolley*, 178 Ill. 2d 175, 209-10 (1997). However, taken in context, the prosecutor's comments in this case do not constitute a misstatement of the law. The prosecutor did ask whether defendant's ability to adapt to prison life was "relevant" to whether defendant should receive the death penalty. In referring to relevance, however, it is clear the prosecutor was not suggesting Dr. Cunningham's testimony was legally irrelevant or inadmissible, or that it should not be considered as evidence in mitigation. Rather, the prosecutor was suggesting that given the nature of the crime and the fact that there were multiple victims, defendant's evidence in mitigation was not substantial and was insufficient to overcome the much stronger evidence in aggravation.

In fact, the prosecutor prefaced his remarks regarding Dr. Cunningham's testimony by saying "the instructions say that you must also consider the evidence in mitigation, and we ask that you do that, that you do your duty and consider the evidence in mitigation." The prosecutor later suggested that Dr. Cunningham's testimony was not entitled to much weight. He also suggested that evidence from defendant's jail guard and community service supervisor were entitled to little weight. Throughout his closing argument, the prosecutor emphasized the weight that should be given to defendant's evidence in mitigation. Although the State, as would be expected, asked the jury to give little weight to this evidence, it nonetheless acknowledged that the evidence must be considered. Contrary to defendant's assertion that the State removed defendant's mitigation evidence from the sentencing equation, the prosecutor in this case asked only that the jury put a smaller value on defendant's evidence in that equation.

Moreover, the jury was instructed that it was to weigh all the evidence received in both parts of the death penalty hearing. The court instructed the jury that in considering the evidence it must weigh any aggravating and mitigating factors. The jury heard Dr. Cunningham's testimony and the rest of defendant's evidence. Counsel for defendant suggested this evidence should carry great weight with the jury, while

the prosecutor suggested the jury should give this evidence little weight.

Had the jury been instructed not to consider evidence of his ability to adapt to prison life as mitigating evidence, it would constitute error. However, in this case, the comments, taken in context, did not undermine the court's instruction to weigh all of the evidence in aggravation and mitigation. It was not error for the court to allow the prosecutor's comment. Because we find there was no error, we need not address the remaining parts of plain error review.

## VII. Prosecutor's Remarks in Closing Argument
### Regarding Evidence in Aggravation

Next, defendant argues that the State violated the trial court's discovery sanction order by arguing that defendant committed the murders in order to prevent the victims from being witnesses against him.

In July 2006, defendant requested notice from the State of the statutory aggravating factors upon which the State would rely. The State failed to respond by the court-imposed deadline in December of that year. Defendant sought to have the State sanctioned by not allowing it to seek the death penalty. The trial court declined to grant this request. The court did so because it found the State was nonetheless in substantial compliance with Rule 416. The court concluded that defendant suffered no prejudice or surprise as a result of the State's violation of the rule, as he had been on notice since the very start of the trial that the State would be seeking the death penalty and that the State would argue several statutory and nonstatutory factors.

However, although the court denied defendant's request, the court did restrict the State only to those aggravating factors originally disclosed prior to defendant's first trial. The statutory aggravating factors originally disclosed were that the defendant (1) committed multiple murders, (2) committed a murder in the course of another felony and (3) committed a murder in a cold and calculated way. The State had also disclosed several nonstatutory aggravating factors. The State argued that the young age of the victims, the "execution" manner of the murders, the unprovoked nature of the offenses, the

defenselessness of the victims, defendant's prior criminal history and defendant's lack of remorse were all aggravating factors.

Defendant is not challenging this remedy fashioned by the trial court. Rather, defendant is challenging an alleged violation of the court's order restricting the State's available arguments. Specifically, defendant alleges that the State argued the following statutory aggravating factor:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

* * *

(8) the defendant committed the murder with intent to prevent the murdered individual from testifying or participating in any criminal investigation or prosecution or giving material assistance to the State in any investigation or prosecution, either against the defendant or another; or the defendant committed the murder because the murdered individual was a witness in any prosecution or gave material assistance to the State in any investigation or prosecution, either against the defendant or another; for purposes of this paragraph (8), 'participating in any criminal investigation or prosecution' is intended to include those appearing in the proceedings in any capacity such as trial judges, prosecutors, defense attorneys, investigators, witnesses, or jurors[.] 720 ILCS 5/9–1(b)(8) (West 2006).

Throughout the State's closing statement, the prosecutor expressly argued that defendant killed L.M. and Lonna to prevent them from being witnesses against him. Defendant argues that, with this part of the State's closing, the State violated the trial court's order limiting argument to those aggravating factors originally disclosed in 1997. Defendant argues he is entitled to a new sentencing hearing as a result of this violation.

Defendant first acknowledges that he failed to properly preserve this issue for appeal. No objection was made at trial to the State's statements and defendant failed to raise the issue in a posttrial motion.

Thus, defendant argues the issue should be reviewed for plain error. As noted above, a reviewing court will only reverse for plain error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565.

We first consider whether a clear or obvious error occurred. If the prosecutor's comments constitute an argument for the statutory aggravating factor in section 9–1(b)(8) of the Criminal Code, then the State violated the trial court's order. Under that scenario, we would then consider whether defendant is entitled to a new sentencing hearing based on the closeness of the evidence or the seriousness of the error. However, the State's argument is that it did not improperly argue a statutory aggravating factor. The State contends that no clear or obvious error occurred because the trial court's order imposed limitations only on the available statutory aggravating factors and did not limit nonstatutory aggravating evidence. The State also argues that the statements made during closing argument referred to conduct that does not qualify for the statutory aggravating factor specified in subsection (b)(8) and, therefore, did not improperly argue an additional statutory aggravating factor. Rather, the prosecutor's comments provided the basis for a nonstatutory aggravating factor. Thus, for defendant to prevail, either we must conclude that the prosecutor improperly argued an undisclosed statutory aggravating factor or, in the alternative, we must reject the State's argument that the trial court's order limiting the aggravating factors to be argued during the sentencing phase did not also preclude additional nonstatutory factors.

The State's argument on this issue rests on there being a significant distinction between the argument that defendant was motivated to kill his victims by a desire to prevent them from later serving as witness and an argument based on the statutory factor covering that very motivation. The State argues it can argue the former without arguing the latter if the motivation and circumstances of the crime do not meet the technical requirements of the statutory factor codified in subsection (b)(8).

The State distinguishes *People v. Adams*, 109 Ill. 2d 102 (1985). In that case, the prosecutor made several references which expressly argued application of subsection (b)(8). In the first phase of the sentencing trial, the prosecutor stated, "I would ask you to sign the verdict finding the aggravating factors stating that Adams not only committed murder and armed robbery but he committed in the fashion that the Legislature has said if you do it that way with the intent, if you are the person who did it, if you do it to knock off a witness, then you qualify for the death penalty." (Emphasis omitted.) *Adams*, 109 Ill. 2d at 125-26. In the second phase, the prosecutor was more direct, stating "there's another factor and another way that Adams qualified for falling into the category of the death penalty, and that was that the murdered individual was a witness in the prosecution or was an eyewitness or possessed other material evidence against the Defendant." *Adams*, 109 Ill. 2d at 128.

In *Adams*, this court concluded, based on *People v. Brownell*, 79 Ill. 2d 508, 525-26 (1980), that subsection (b)(8) could not be used as an aggravating factor permitting the State to "regard the slain person not only as the victim of murder but also as a witness to the crime of his own murder as well." *Adams*, 109 Ill. 2d at 127.

In this case, as noted above, the State argued in closing that defendant executed L.M. "to prevent her from being a witness against him." The record does reflect that defendant told police he was afraid L.M. would "tell on him." However, the State argues that this statement should not be construed as a suggestion by the State that subsection (b)(8) applies. Specifically, the State notes "it is implausible that defendant killed L.M. with the intent to silence her from talking *to police* that is required under subsection (b)(8)." (Emphasis in original.) We agree with the State that *Adams* would have prevented the State from seeking and arguing an instruction based on the statutory aggravating factor of killing a witness, as L.M. was a witness only to the crimes being perpetrated by the defendant at that time–her rape and murder. Likewise, at trial the State suggested that Lonna was killed because "[t]his defendant can't have any witnesses. He had just shot Rachel, and 12-year-old Lonna knows him. She begged for her life. She could also be a witness, and he can't have that. So he executed her, too." Again, under *Adams*, the only crimes to which Lonna was a witness were those crimes being committed by the

defendant at that time, including her own murder.

The State, therefore, recognizes that section (b)(8) could not have applied and that arguing this statutory factor would have been improper. However, as the State suggests, arguing that defendant did not want to leave any witnesses is not the same as arguing the statutory factor. Importantly, unlike the prosecutor in *Adams*, the State here made no reference to subsection (b)(8) or to the legislature having decided this factor was important. As far as the jury was concerned, defendant's motivation to leave no witnesses had no *imprimatur* from the legislature and the jury could choose, or choose not, to assign aggravating weight to that motivation. Thus, although the State was not entitled to argue the statutory aggravating factor codified in subsection (b)(8), both by the factor's own terms and by the limits placed upon the State by the trial court, the State was entitled to argue the facts and circumstances of the case as a nonstatutory aggravating factor.

By way of analogy, subsection (b)(7) is an aggravating factor based on the age of the victim and the cruelty leading to the victim's death. However, if a victim in a particular case were over 12 years old, the State is not precluded from arguing, as a nonstatutory factor, that the victim was young and that his death resulted from cruel, brutal and heinous behavior. Indeed, in this case, the jury was not instructed to consider the statutory factor codified at subsection (b)(7). Nonetheless, the State emphasized that Lonna was 12 years old and that defendant coldly executed her after she begged for her life.

Although we agree that the State did not improperly argue an additional statutory factor, we must still ask whether the trial court's order also prevented the State from arguing additional nonstatutory factors. The State argues that the context of the discussion regarding the discovery violation suggests that the court's order prohibited the State only from arguing additional statutory factors. The State also asserts that a defendant is not entitled to disclosure of nonstatutory aggravating factors and that, therefore, even if the court intended to prohibit additional nonstatutory aggravating factors, it was improper for the court to enter such an order.

Defendant's original motion for discovery, which the trial court granted, asked the court to compel discovery of aggravating factors pursuant to Supreme Court Rule 416. Defendant asked that he be

informed "which statutory and non-statutory aggravating factors the State intends to rely upon." However, although defendant's motion asked for disclosure of both types of aggravating factors, Rule 416 requires the State to file a "Notice of Intent to Seek or Decline Death Penalty," which "shall also include all of the *statutory* aggravating factors enumerated in section 9–1(b) of the Criminal Code of 1961." (Emphasis added.) 188 Ill. 2d R. 416(c). Thus, the rule itself does not expressly require disclosure of nonstatutory aggravating factors.

The discussion of defendant's motion seeking to bar the State from seeking the death penalty also fails to support defendant's argument and instead suggests that only disclosure of statutory aggravating factors was required. Counsel for the defendant suggested to the court that "the issue that the defendant has raised is whether there is compliance with Rule 416." Later, after the State had provided the court with its original notice of intent, filed in 1996, defense counsel again referenced Rule 416, noting "[Rule] 416 says 'the State shall' in two places and puts the burden and requirement on the State." Counsel noted defendant "filed a motion *** requesting that [the State] give us those aggravating factors as they are required to do by rule." Counsel's argument was centered on its claim that the State had failed to conform to the rule.

The trial court acknowledged this fact, specifically noting "the issue in this matter is whether the State complied with the requirements of Supreme Court Rule 416 in disclosing to the defendant the statutory aggravating factors which it intends to prove in the sentencing phase of this proceeding." The State's argument acknowledged that there had been a technical violation of Rule 416 in that it had not complied with the court's order to again provide disclosure of the statutory aggravating factors. Still, the State argued that the "spirit and the letter of 416 were complied with ten years ago" and that there was no danger of unfair surprise to defendant

After considering the parties' arguments, the court found that "there has been a failure to make a written disclosure pursuant to Supreme Court Rule 416(c)." As noted above, however, the court concluded that there was substantial compliance with the rule because the State had, prior to defendant's first trial, provided written disclosure of aggravating factors and had, prior to the second trial, orally indicated it would be seeking the death penalty. In fashioning a

remedy when there is substantial compliance with the rule, the court noted that the purpose of the rule is to avoid unfair surprise. Concluding that there had been no surprise to defendant, the court declined to grant defendant's motion in full. Instead, it allowed the State to seek the death penalty, but required it to comply with Rule 416(c) by the end of the day and prohibited the State from adding "aggravating factors" that were not originally disclosed.

Although the court's order did not expressly limit the aggravating factors to be disclosed, we conclude that given the framing of the issue by the court and both parties, the court's order instructed the State to bring itself into compliance with Rule 416. Rule 416 requires only disclosure of statutory aggravating factors. Although the State, prior to the first trial, did opt to inform the defendant of the nonstatutory aggravating factors it intended to argue, Rule 416 does not compel the State to do so. Therefore, the fact that the State did not disclose this additional argument as a nonstatutory aggravating factor cannot be a ground upon which we can grant defendant relief.

As we conclude that the trial court's order limiting the State's use of additional aggravating factors applied only to statutory factors, we need not address the State's second argument that any order limiting nonstatutory aggravating factors was improper.

Because the State's arguments were proper, we also conclude that no clear or obvious error occurred and, therefore, we need not address the rest of defendant's plain-error argument.

## VIII. Supreme Court's Duty to Conduct Independent Review of Death Sentence

We find no basis for reversal of defendant's sentence in the issues he has raised before this court. However, "[w]hen requested to do so, this court reviews the evidence in a capital sentencing hearing to determine whether death is the appropriate penalty, even in the absence of trial error." *People v. Thompson*, 222 Ill. 2d 1, 36 (2006). If we find that the sentence of death is fundamentally unjust, given the facts of the particular case, we may overturn the sentence and order the imposition of imprisonment. 720 ILCS 5/9–1(i) (West 2008).

After careful consideration of the evidence adduced, we find no fundamental injustice in this case and concur in the jury's

determination that death is the appropriate penalty.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and death sentence. We direct the clerk of this court to enter an order setting Tuesday, January 11, 2011, as the date on which the sentence of death shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*